557 P.2d 1072

J. L. WEAVER and Doris E. Weaver,
his wife, Appellants,

v.

TRI CITY CREDIT BUREAU, a defunct
Arizona Corporation, Lawrence H. Martin
and Eleanor M. Martin, as officers of Tri
City Credit Bureau and Individually, Trans-
america Title Corp., successor to Phoenix
Title and Trust Company, Trustee, Arcoa
International, Inc., an Oregon Corporation,
formerly known as Arcoa, Inc., Stanley
Szymanski and Emillie Szymanski, his wife,
S. A. Dombrowski and C. D. Dombrowski,
his wife, Littleland Day Care Schools of
America, an Arizona Corporation, City of
Tempe, a Body Politic, State of Arizona, a
Body Politic, John Does I through X and
Jane Does I through X, White Corpora-
tions I through X, Black Corporations I
through X, the unknown heirs of Stanley
Szymanski and Emillie Szymanski, S. A.
Dombrowski and C. D. Dombrowski, if they
be Deceased, Appellees.

No. I CA–CIV 2912.

Court of Appeals of Arizona,
Division 1,
Department B.

Oct. 5, 1976.

Rehearing Denied Nov. 16, 1976.

Review Denied Dec. 14, 1976.

Hocker & Gilcrease, Ltd., by R. Kelly Hocker, Tempe, for appellants.

Keane & Vermeire by Albert R. Vermeire and Fennemore, Craig, von Ammon & Udall by Philip A. Edlund, Phoenix, for appellees Szymanski and Dombrowski.

Fannin, Cruse & Frost by Robert J. Cruse, Phoenix, for appellee Advanced Management Engineering and Research.

Berry & Herrick, P. A., by Richard S. Berry, Tempe, for appellee Littleland Day Care School of America.

## OPINION

JACOBSON, Judge.

We are asked to determine whether a "Real Estate Agreement", utilized by a lending institution in connection with a loan, may be enforced as either an express or equitable mortgage.

This issue arose out of an action instituted by appellants, J. L. Weaver and Doris E. Weaver (Weaver) against the appellees seeking to foreclose, as a realty mortgage, a "Real Property Agreement" and to quiet title. The trial court held, insofar as pertinent to this appeal, that the agreement was not a mortgage, either express or equitable, and denied foreclosure of the instrument or the right to quiet title based thereon.

The facts giving rise to this litigation are not in substantial dispute. On July 19, 1965, Tri City Credit Bureau (Tri City) through its president, Lawrence H. Martin, obtained a loan from Saguaro Bank (Bank), predecessor in interest to the United Bank, in the sum of $11,198.52. Concurrently with the obtaining of the loan, Tri City signed a promissory note to the Bank, a "Real Property Agreement"[1]

1. The "Real Property Agreement" reads as follows:

"In consideration of such loans and indebtedness as shall be made by or become due to SAGUARO BANK (hereinafter referred to as "Bank") to or from the undersigned, jointly or severally, and until all such loans and indebtedness have been paid in full, or until twenty-one years following the death of the last survivor of the undersigned, whichever first occurs, the undersigned, jointly and severally, promise and agree

1. To pay, prior to becoming delinquent, all taxes, assessments, dues and charges of every kind imposed or levied upon the real property described below; and

2. Without the prior written consent of Bank, to refrain from creating or permitting any lien or other encumbrance (other than those presently existing) to exist on, and from transferring, selling, assigning or in any manner disposing of, the real property described below, or any interest therein; and

3. Hereby assign, transfer and set over to Bank, its successors and assigns, all monies now due and hereafter becoming due to the undersigned, as rental, or otherwise, and howsoever for or on account of that certain real property situated in the County of Maricopa, State of Arizona, described as follows:

Lot 4, Margo Manor (According to Book 85 of Maps, Page 36 of Maricopa County, Arizona)

and hereby irrevocably authorize and direct all lessees, escrow holders and others to pay to Bank, all rent and all other monies whatsoever and whensoever becoming due to the undersigned, or any of them, and howsoever for or on account of said real property, and hereby irrevocably appoint bank, as attorney in fact, with full power and authority, in the name of the undersigned, or in its own name, to endorse and negotiate checks, drafts and other instruments received in payment of, and to receive, receipt for and to enforce payment, by suit or otherwise, of all said rents and sums; but agrees that Bank shall have no obligation so to do, or to perform or discharge any obligation, duty or liability of the undersigned in connection therewith.

4. That if default be made in the performance of any of the terms hereof, or if any of said rental or other sums be not paid to Bank when due, Bank, at its election, may declare the entire remaining unpaid principal and interest of any obligation or indebtedness then remaining unpaid to Bank to be due and payable forthwith.

5. That Bank may and is hereby authorized and permitted to cause this instrument to be recorded at such time and in such places as Bank, in its discretion, may elect.

6. Upon payment of all indebtedness of the undersigned to Bank this agreement shall be and become void and of no effect, and until then it shall apply to and bind the undersigned, their heirs, legatees, devisees, administrators, executors, successors and assigns, and inure to the benefit of Bank and its successors and assigns. The affidavit of any

covering property owned by Tri City, a chattel mortgage on certain furniture owned by Tri City and a continuing guarantee executed by Weaver guaranteeing Tri City's obligation to the Bank.

At this time the real property, which was the subject of the "Real Property Agreement", was encumbered by a first mortgage. Also, at this time, A.R.S. § 6–256, as amended 1963, was in effect in Arizona and provided, in part, that:

> "A. A bank shall not own, acquire or take as security for repayment of a loan any lien on real property *other than a first lien,* except to secure or to further secure a debt previously contracted and owing to the bank or except as additional but *not primary collateral.*" (emphasis added). Laws 1963, Ch. 82, § 7.

The "Real Property Agreement" was duly recorded. Subsequently, the real property which was the subject of the agreement was conveyed by Tri City to appellee, Arcoa International, Inc.; by Arcoa to appellees Szymanski and Dombrowski; and by them to appellee, Littleland Day Care Schools of America. At the time of the Tri City-Arcoa transfer, the Bank notified Arcoa of the existing indebtedness owed by Tri City to the Bank. The Bank made no effort to enforce whatever rights it held under the agreement against any of the grantees of the subject real property.

Tri City subsequently defaulted upon its note. The Bank made demand under the continuing guarantee upon Weaver who paid the Bank the balance due in the sum of $4,788.00, obtained an assignment of the *promissory note and the* "Real Property Agreement." After the Bank had failed to make any effort to enforce its rights under the agreement, Weaver instituted this action to construe the "Real Property Agreement" as a mortgage and to foreclose it. Tri City is defunct and Martin's whereabouts are unknown.

During the course of the trial, Weaver attempted to introduce the testimony of an attorney for Saguaro Bank, the vice president of United Bank, and of a title insurance company officer to show the use of the real property agreement as a security device. The trial court rejected this testimony. The trial court also rejected testimony by Weaver concerning a conversation he had with Martin and a Bank official at the time the continuing guarantee was executed by Weaver as to the intent of the parties in executing the real property agreement. Offers of proof were made on the rejected testimony.

Weaver first argues that the "Real Property Agreement", *supra,* footnote 1, is an express mortgage. A.R.S. § 33–702 in effect at the time of this transaction provided in part:

> "*Every transfer of an interest in property,* other than in trust, . . . made only as security for performance of another act is a mortgage. The fact that a transfer was made subject to defeasance on a condition, may, for the purpose of showing that the transfer is a mortgage, be proved except against a subsequent purchaser or encumbrancer for value and without notice, notwithstanding that the fact does not appear by the terms of the instrument." (emphasis added) Laws 1971, Ch. 136, § 4.

A statutory prerequisite to the formation of a mortgage is a "transfer of an interest in property." As can be seen from the agreement, nowhere does it provide for a "transfer of an interest" in the real property from Tri City to the Bank. The most that can be said in this regard is that the agreement assigns to the Bank any rents or proceeds due the assignor from the property. Weaver urges that such an assignment of rents and proceeds is an assignment of an interest in the real property itself and therefore qualifies as a "trans-

officer or department manager of Bank showing any part of said indebtedness to remain unpaid shall be and constitute conclusive evidence of the validity, effectiveness and con-

tinuing force of this agreement and any person may and is hereby authorized to rely thereon."

fer" within the meaning of A.R.S. § 33–702. We disagree. Weaver has cited us to no meaningful authority which supports the proposition that an assignment of rents or proceeds of sale is also an assignment of an interest in the underlying real property giving rise to the rents or proceeds. Finding no language in the agreement capable of such interpretation, we hold that this assignment of rents and proceeds does not operate as a "transfer" of an interest in the underlying real property so as to fall within the express mortgage definition of A.R.S. § 33–702.

Nor does the fact that the "Real Property Agreement" contains a covenant against future transfers or encumbrances operate as a "transfer" within the meaning of A.R.S. § 33–702. Such a covenant is sometimes referred to as a "negative pledge" agreement. See, Coogan, Kripke, and Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements*, 79 Harv.L.Rev. 229, 263–264 (1965). As stated in the Coogan, Kripke, and Weiss article:

> "The case law in this area is rather thin and in general dates from the depression. It indicates that a purely negative covenant creates no security interest in the property described." 79 Harv.L.Rev. at 264.

Also *see, Kuppenheimer & Co. v. Mornin,* 78 F.2d 261 (8th Cir.), *cert. denied,* 296 U. S. 615, 56 S.Ct. 135, 80 L.Ed. 436 (1936); *Redemptorist Fathers of State of Washington v. Purdy,* 174 Wash. 358, 24 P.2d 1089 (1933); *Western States Finance Co. v. Ruff,* 108 Or. 442, 215 P. 501 (1923).

What we have said concerning an express mortgage, should also dispose of Weaver's contention that the instrument is an "equitable" mortgage as the statutory language is broad enough to encompass the concept of an equitable mortgage. However, Weaver relies heavily upon the California Supreme Court decision in *Coast Bank v. Minderhout,* 61 Cal.2d 311, 38 Cal.Rptr. 505, 392 P.2d 265 (1964). In *Coast Bank,* the court was construing a similar, though not identical, instrument to that under consideration here, entitled "Agreement Not to Encumber or Transfer Property," and held that this instrument constituted an equitable mortgage. In reaching this conclusion, the court first cited 4 Pomeroy, Equity Jurisprudence (5th Ed. Symons) § 1235 to the effect that:

> "[E]very express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation . . . creates an equitable lien upon the property so indicated . . . ." 61 Cal.2d at 313–314, 38 Cal. Rptr. at 506, 392 P.2d at 266.

The court then noted that:

> "In the present case . . . plaintiff pleaded and defendants admitted by demurring and failing to answer that the parties intended to create a security interest in the property. Accordingly, the question presented is not what meaning appears from the face of the instrument alone, but whether the pleaded meaning is one to which the instrument is reasonably susceptible." (citation omitted). 61 Cal.2d at 315, 38 Cal.Rptr. at 507, 392 P. 2d at 267.

The court then went on to hold:

> "The instrument restricts the rights of the [defendants] in dealing with their property for plaintiff's benefits; it describes itself as 'For use with Property Improvement Loan,' it specifically sets forth the property it covers, and it authorizes plaintiff to record it. These provisions afford some indication that the parties intended to create a security interest and are clearly sufficient *to support the pleaded meaning.*" (emphasis added) 61 Cal.2d at 315, 38 Cal.Rptr. at 507, 392 P.2d at 267.

In our opinion, the reasoning in *Coast Bank* is initially weak and is further weakened by the subsequent California decisions of *Tahoe National Bank v. Phillips,* 4 Cal. 3d 11, 92 Cal.Rptr. 704, 480 P.2d 320 (1971), and *Orange County Teachers' Credit Union v. Peppard,* 21 Cal.App.3d 448, 98 Cal.Rptr. 533 (1971).

In *Tahoe National Bank,* the California Supreme Court was again asked to determine whether an instrument entitled "Assignment of Rents and Agreement Not to Sell or Encumber Real Property" was an equitable mortgage. This instrument is more similar to the agreement under consideration in the case *sub judice* than that contained in *Coast Bank,* as it contained both an assignment of rents and proceeds and a negative pledge not to sell or further encumber. After holding that the agreement did not constitute an equitable mortgage, the *Tahoe National Bank* court, correctly, in our opinion, anayzed the agreement:

> "Its title gives no hint of a power of foreclosure. It contains no language of hypothecation, no provisions imposing a lien or creating a mortgage, no discussion of foreclosure [citations omitted]. The substance of the document comprises six covenants by the borrower, none of which purport to give the bank a lien on real property. The covenants respecting recordation and duration of the agreement, and persons bound by its terms, are consistent with a mortgage, but they are equally consistent with an instrument designed to afford the bank the security that the borrower retains unencumbered assets." 4 Cal.3d at 18, 92 Cal.Rptr. at 710, 480 P.2d at 326.

In *Orange County Teachers' Credit Union v. Peppard, supra,* the California Court of Appeals was faced with the task of reconciling the holdings in *Coast Bank* and *Tahoe National Bank* in construing an "Agreement and Assignment of Rents," almost identical to the agreement in this case. In holding that the agreement involved did not constitute an equitable mortgage, the California Court of Appeals again noted:

> "[I]ts title gives no hint of the power of foreclosure, and it contains no language of hypothecation, no provisions imposing a lien or mortgage, and no discussion of foreclosure." 21 Cal.App.3d at 454, 98 Cal.Rptr. at 538.

In our case, an even stronger argument is made for not construing this document as an equitable mortgage. Like the instruments construed in *Tahoe National Bank* and *Orange County Teachers' Credit Union,* this instrument contains no language of hypothecation, no provisions imposing a lien and no provisions concerning foreclosure in the event of default on Tri City's obligation. Moreover, at the time this agreement was executed Arizona had a specific statute prohibiting the Bank from taking a mortgage on real property under the circumstances involved here, A.R.S. § 6–256.

This is not a case where two parties strove mightily to create a mortgage, but through inadvertence did not technically achieve their purpose so that equity must come to their rescue by imposing an equitable lien. *See, Stephen v. Patterson,* 21 Ariz. 308, 188 P. 131 (1920). Rather, this is a case where one of the parties (the Bank) strove mightily to avoid the creation of a mortgage on the real property, for to do so would put it in violation of A.R.S. § 6–256. Moreover, the record indicates that the parties to the agreement were not operating under any conditions which suggest fraud or duress.

■ Under these circumstances, and primarily from the interpretation of the language employed in the "Real Property Agreement" we decline to follow *Coast Bank v. Minderhout, supra.* We have no hesitancy in holding that this document did not create an equitable mortgage on the real property.

Weaver argues, however, that the agreement is ambiguous and thus oral testimony was admissible to explain its effect or to show the intent of the parties in executing the document. We disagree. The clear language of the agreement shows that it operated as security for Tri City's loan. The security exacted, however, was not on the real property itself but only on the rents and proceeds from the property to the Bank with a further extracting of mere promises from Tri City that it would not sell or encumber the property further. The assignment of rents and proceeds would have allowed the Bank, if it so desired, upon timely action, to obtain the proceeds of the sale from Tri City to Arcoa International, Inc. The negative pledges against sale and future encumbrances assured the Bank that the real property would be available for execution in a specific amount upon judgment being obtained against Tri City by the Bank. Both of these promises were the legitimate concern of the lender, without imposing a lien upon the real property. Finding no ambiguity in the agreement, the trial court properly excluded oral testimony attempting to vary its terms or explain its meaning.

Finally, Weaver argues that his testimony concerning the conversation between himself, Mr. Martin, the president of Tri City, and the bank officer was admissible to show intent to create an equitable mortgage. Aside from the implication of the parol evidence rule previously discussed, the problem with this theory is that this conversation is hearsay. If we say the conversation fell into hearsay exception dealing with Weaver's state of mind, Weaver's state of mind is immaterial to a determination of the intent of the contracting parties—Tri City and the Bank.

By reason of the foregoing, the judgment of the trial court is affirmed.

SCHROEDER, P. J., and EUBANK, J., concur.