# THE EQUITABLE TRUST COMPANY *v.* THOMAS L. IMBESI ET AL.

[Misc. No. 8, September Term, 1979.]

*Decided March 10, 1980.*

250

The cause was argued before SMITH, DIGGES, ELDRIDGE, COLE and DAVIDSON, JJ.

*Gary C. Duvall* for appellant.

*Thomas L. Hudson,* with whom were *Frank A. LaFalce*

and *Cook, Howard, Downes & Tracy* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

We shall here hold that in Maryland an agreement between a borrower and a lender that a borrower will neither convey nor encumber specified land creates no lien in favor of the lender.

Under Maryland Code (1974) § 12-601, Courts and Judicial Proceedings Article, jurisdiction is granted to this Court to "answer questions of law certified to it by ... a United States District Court ... if there is involved in any proceeding before the certifying court a question of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the Court of Appeals of this state." Pursuant to that authority, the United States District Court for the District of Maryland certified to us the following questions:

(1) Is a "covenant not to encumber or convey real property", such as Plaintiff's Exhibit 2, an equitable lien or mortgage so that it is paramount to subsequent mortgages or judgment liens on the same property?

(2) Is extrinsic testimony concerning the intent of the parties to a "covenant not to encumber or convey real property" admissible for purposes of deciding certified question (1)?

Because we regard the instrument here as unambiguous, under our parol evidence rule we shall also answer the second question in the negative.

I

Thomas L. Imbesi (Imbesi) and his son borrowed $60,000 from The Equitable Trust Company, a Baltimore bank. Imbesi executed an assignment of certain life insurance to secure repayment of the debt together with an instrument

entitled "Covenant Not to Encumber or Convey Real Estate." It mentioned certain real estate and said that so long as Imbesi was indebted to Equitable he would "not make, or cause to be made any deed of trust, mortgage, conveyance or any other instrument or agreement having the effect of a lien upon or conveyance of the real estate [then] owned by [him]" and thereafter mentioned.[1] The instrument was acknowledged before a notary public and recorded among the land records of Baltimore County. The recordation tax placed upon instruments securing debts was paid. The loan was for use in a business which apparently was carried on by the son.

A little more than a year later the son borrowed a substantial sum of money from another Baltimore bank. Imbesi guaranteed payment of that loan, signing a guaranty on the form of the Small Business Administration. That indemnity agreement was secured by a mortgage on the land

---

1. The agreement is on a printed form which Equitable apparently had prepared. It states in pertinent part:

### COVENANT NOT TO ENCUMBER OR CONVEY REAL ESTATE

IN CONSIDERATION OF THE EQUITABLE TRUST COMPANY agreeing to loan me/us the sum of $60,000.00, and for other good and valuable considerations, I/we covenant and agree that so long as I/we shall be indebted to the said The Equitable Trust Company, or its assigns, whether as maker, endorser, guarantor, or otherwise, whether such obligation be incurred before or after the date hereof, and until this instrument is formally released, I/we shall not make, or cause to be made any deed of trust, mortgage, conveyance or any other instrument or agreement having the effect of a lien upon or conveyance of the real estate now owned by me/us, and described as follows:

"Being all that lot or lots of ground, the improvements being known as Box 325 C South Lakeway Drive; Randallstown, Maryland and more particularly described in a Deed from Folly Farms One, Inc. to Thomas L. Imbesi and recorded among the Land Records of Baltimore County in Liber No. 5233, Folio 565, . . . in fee simple" . . .

IN WITNESS WHEREOF, I/we have hereunto affixed my/our hand(s) and seal(s) this 7th day of July, 1975.

WITNESS:

/s/ Leslie L. Lewis, Jr.                    /s/ Thomas L. Imbesi (SEAL)
Leslie L. Lewis, Jr.                        Thomas L. Imbesi

mentioned in the covenant not to encumber. This mortgage also was duly recorded among the land records of Baltimore County.

The second bank ultimately entered judgment against Imbesi. The judgment was assigned to a corporation in which Imbesi held a large interest.

A suit to foreclose the covenant not to encumber was filed by Equitable in the Circuit Court for Baltimore County. Defendants included Imbesi, the second bank, and the assignee of the judgment. Thereafter the mortgage of the second bank was assigned to the Small Business Administration. It then was substituted as a defendant in the foreclosure proceeding. SBA promptly removed the case to the United States District Court for the District of Maryland.

## II

Although we have reason to believe that covenants such as that here in issue have been somewhat widely used in recent years by some Maryland banks, this is a case of first impression in this State. Moreover, very few courts seem to have had similar instruments before them.

Equitable is of the view that the instrument here, "on its face, [is] precisely the type of agreement which creates an equitable lien or mortgage."

We start with the fact that this instrument by no stretch of the imagination can legitimately be called a mortgage and that it does not even purport to be in the form of a mortgage. In *Bank v. Lanahan,* 45 Md. 396 (1876), Judge Alvey set forth for the Court the characteristics of a mortgage:

> By the legal, formal mortgage, as distinguished from instruments held to be mortgages by construction of Courts of Equity, the property is conveyed or assigned by the mortgagor to the mortgagee, in form like that of an absolute legal conveyance, but subject to a proviso or condition by

> which the conveyance is to become void, or the estate is to be reconveyed, upon payment to the mortgagee of the principal sum secured, with interest, on a day certain; and upon nonperformance of this condition, the mortgagee's conditional estate becomes absolute at law, and he may take possession thereof, but it remains redeemable in equity during a certain period under the rules imposed by Courts of Equity, or by statute. [*Id.* at 407.]

It will be seen that this instrument has in it none of the requisites of a mortgage set forth for the Court by Judge Alvey in that case.

Equitable does not say that this is a proper mortgage, but suggests it is an equitable mortgage. Without exception, the instruments which we have held to be equitable mortgages have been ones which on their face appeared to be mortgages but which were defective in some manner. For instance, in *LeBrun v. Prosise,* 197 Md. 466, 477, 79 A.2d 543 (1951), Judge Markell quoted from *Dyson v. Simmons,* 48 Md. 207 (1878), where Judge Alvey said for the Court:

> The principle is now so well settled, that it would seem to be beyond all question and controversy, that if a party makes a mortgage, or affects to make one, but it proves to be defective, by reason of some informality or omission, such as failure to record in due time, defective acknowledgment, or the like, though even by the omission of the mortgagee himself, as the instrument is at least evidence of an agreement to convey, the conscience of the mortgagor is bound, and it will be enforced by a court of equity. [*Id.* 48 Md. at 214.]

In *Dyson* the mortgage was recorded in Montgomery County where the land was situate, but the acknowledgment was taken before a justice of the peace in Frederick County. Our statute at the time required that if an acknowledgment were taken before a justice of the peace "out of the county . . . wherein the real estate or any part of it lies," then "the

official character of the justice [was required to be] certified to by the clerk of the circuit or superior court under his official seal." [2] This certificate was missing.

These principles relative to equitable mortgages were discussed for the Court by Chief Judge Hammond in *Adams v. Avirett,* 252 Md. 566, 250 A.2d 891 (1969). In that instance the purported acknowledgment of a deed of trust was made over the telephone to a notary whom the grantors never saw. In finding "that the deed of trust created an equitable lien fully valid as far as [the parties to it were] concerned," Judge Hammond said for the Court:

> The law of Maryland is therefore that where one who has the right and power to do so intends by a writing to create a lien on his land to secure another but fails to create a statutorily valid security instrument, his expressed intention may be enforced in equity by the other party to the instrument. [*Id.* at 571.]

The Court quoted from 5 H. Tiffany, *The Law of Real Property* § 1563 at 659-60 (3d ed., B. Jones 1939), and 4 *American Law of Property* § 16.30 (1952), observing that "Maryland decisions are in accord with the law set forth in Tiffany and the *American Law of Property.*" *Id.* at 569.

In *Lubin v. Klein,* 232 Md. 369, 193 A.2d 46 (1963), the Court held that "a defectively executed mortgage c[ould] be recognized as an equitable mortgage only when the party who executed it had the power to charge the land, and there is no such power in a person acting under an unacknowledged power of attorney . . . ." *Id.* at 372. Thus, it held "that the mortgage in th[at] case was void (except as between the parties) and did not create an equitable lien on the property." *Id.* at 372-73.

Equitable liens have been held to arise in Maryland under

---

**2.** This provision, prior to its repeal by Chapter 404 of the Acts of 1953, was most recently codified in Code (1951) Art. 21, § 5. Acknowledgments are now governed by Code (1957) Art. 18. Sections 1 to 14 of that article, the Uniform Acknowledgments Act, were enacted by Chapter 219 of the Acts of 1941.

circumstances other than those of some defect in a mortgage or deed of trust. See in this regard an annotation on equitable liens by William T. Brantly published in 1885 appearing opposite page 139 in his edition of *Alexander v. Ghiselin,* 5 Gill. 138 (1847). In *Keyworth v. Israelson,* 240 Md. 289, 214 A.2d 168 (1965), Judge Oppenheimer said for the Court:

> An equitable lien is based on specific enforcement of a contract to assign property as security. The contract need not stipulate for the lien in express terms; it is enough if that is the fair and reasonable implication of the terms employed. A mere promise to pay a debt or obligation does not of itself, however, create a lien unless the intention to create it is apparent from the instrument and circumstances leading to it. *Johnson v. Johnson,* 40 Md. 189, 196 (1874). See 33 Am. Jur. *Liens* § 18 and 4 Pomeroy's *Equity Jurisprudence* §§ 1235-1237 (5th ed. 1941); but also see 41 Harv. L. Rev. 404 (1928). [*Id.* at 305.]

This is in accord with 4 J. Pomeroy, *Equity Jurisprudence* § 1235 (5th ed., S. Symons 1941), cited in *Keyworth,* where it is stated:

> The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. [*Id.* at 696.]

*Johnson v. Johnson,* 40 Md. 189 (1874), cited in *Keyworth* and much relied upon by Equitable, is illustrative of the circumstances under which we have found equitable liens to exist. In that case an individual claimed money was due him from his father and his uncle. He resided on the farm of the uncle. The uncle conveyed the farm to the claimant's father. After the death of the uncle the son claimed a right of possession of the farm by reason of certain pecuniary claims against the uncle and the father. The father advertised the farm for sale. The son filed a bill in equity to restrain the sale and for a decree that the land be sold for satisfaction of his claims. He and his father reached an agreement by which the father was to pay the son $2,500 in full satisfaction of his claims, "such sum to be paid in a specified manner, namely: Five hundred dollars on or before the expiration of thirty days from the date of the agreement; one thousand dollars out of the first payment made on the sale of the farm . . .; and the other thousand dollars out of the second payment on said farm." *Id.* at 195. The son "promised to give up and surrender to the [father] the immediate possession of the farm, and also all the personal property held by him which had belonged to the [uncle], with certain specified exceptions." *Id.* The father neither sold the farm nor paid the remaining $2,000. The son then sought, as the Court put it, "an enforcement of the [father's] covenant as a charge or lien on the land, and, in that view, praying that the farm be decreed to be sold to raise the fund to pay off the amount due from the [father] on his covenant." *Id.* at 195. The chancellor found in favor of the son. It was in this context that Judge Alvey said for the Court:

> In a case like the present, the question whether there has been a charge created depends in a great measure upon the intention of the contracting parties; and here we think it manifest, as well from the language of the covenant itself as from the circumstances leading to it and under which it was made, that the parties contemplated the sale of the farm, and the proceeds of sale as the fund from which the debt was to be paid. In other words, the

farm was to be sold, and a sufficient amount of the purchase money specifically appropriated to the payment of the debt due the plaintiff. If such be the fair construction of the agreement, it created a charge on the land as a security to the plaintiff; for, as was said by Chancellor Sugden, in *Rolleston v. Morton,* 1 Dr. & W. 195, if a man has power to charge his lands, and agrees to charge them, in equity he has actually charged them; and a Court of Equity will execute the charge. Here, as we have seen, there are no express words creating the lien or charge upon the land; but there is no doubt of the proposition, that a charge may be created by fair and reasonable implication as well as where express words of trust or charge are employed in the covenant or agreement of the parties. Perry on Trusts, sec. 122, and authorities there cited; and 2 Story's Eq. sec. 1246. [*Id.* at 196-97.]

Further illustrative of the matter of equitable liens in Maryland is *Union Trust Co. v. Biggs,* 153 Md. 50, 137 A. 509 (1927). Biggs issued a nonresident attachment against Speers. The sheriff laid the attachment on certain land of Speers in Anne Arundel County. Speers and a corporation filed separate motions to quash the attachment, alleging that Speers had conveyed a part of the land to the corporation. There was a further allegation that there had been no actual levy made upon the land and that although the tract of land was occupied, the sheriff had falsely returned that no person was in possession. An agreement was reached between Biggs and Speers to the effect that the land claimed to have been conveyed away should be released from the attachment, but the lien of the attachment should be retained as to the remainder. Biggs obtained a judgment when the short note case was tried. A mortgage, made and recorded prior to the attachment, was foreclosed. Funds remained in the hands of the assignee in excess of the mortgage claim. Union Trust Company entered a judgment by confession against Speers after the assignee of the

mortgage had filed his report of sale. The Court was faced with a contest in the foreclosure proceeding as to the relative priority of the Union Trust and Biggs claims. Judge Parke pointed out for the Court:

[Biggs] had relied upon the agreement, and neither had sought nor obtained a judgment of condemnation, which would have had merely the effect of adjudicating the property originally attached as that of the debtor and applicable to the satisfaction of the claim of the attaching creditor, and this legal result of a judgment of condemnation is precisely the effect intended to be accomplished by the agreement in the present case. *West v. Wood Co.,* 140 Md. 514, 521 [, 118 A. 69 (1972)]. But this agreement did not authorize the entry of a judgment of condemnation, and it was informal and insufficient at law as a pledge, mortgage, or assignment, so no property right in the equity of redemption was acquired at law by the agreement. But it can not be doubted that it was the express object of the contracting parties for the remaining land to be subject to an effective charge or lien which would secure to the creditor the payment of any judgment she might recover on account of the cause of action on which the attachment had been issued, and that this charge or lien was designed to be something in addition to the personal obligation of the debtor to pay. The mortgagor has long since received and enjoyed the consideration for her undertaking, which equity will not permit her now to repudiate. It is an accepted principle of equity that where, as here, the intention to hold and charge a particular interest or estate as security for the payment of a debt or other obligation is clearly manifested in writing, but frustrated simply through some default of form or in procedure, an equitable lien upon such interest or estate is created, which is enforceable against the property in the hands of not only the original promisor, but

as against his heirs, executors, administrators, voluntary assigns, and purchasers or encumbrancers with notice. See 3 *Pomeroy, Eq. Jur.* (4th Ed.), secs. 1235-1237. Since a judgment is but a general lien and the judgment creditor not a purchaser for value, its lien must yield to the superior equity of a prior specific lien. As the prior specific equitable lien in the pending appeal was designed to retain and appropriate the inchoate lien upon particular property of an existing attachment at law as security for the payment of a debt in an amount to be ascertained by litigation between the creditor and debtor, the nature of this equitable lien is closely analogous to a defective mortgage lien, and so, as in the case of an equitable mortgage lien, the specific equitable lien created by the agreement will be paramount to subsequent judgment creditors who become such on causes of action which existed before the creation of such equitable lien. [*Id.* at 59-61.]

In summary, it would appear that under our cases for an equitable lien to exist a specific intent to create a lien must be made manifest as, for instance, where a written instrument evidences an intent to create a lien but the instrument is imperfect in some regard, such as one with a defective acknowledgment. In the absence of a written contract construed to embody the full agreement of the parties, an equitable lien may be found only where the sum total of the circumstances of the dealings between the parties fairly may be said to evidence an intent to create such a lien.

### III

A limited number of cases involving negative covenants sought to be enforced as liens on land have arisen outside the State of Maryland. The oldest such case seems to be *Knott v. Manufacturing Co.,* 30 W. Va. 790, 5 S.E. 266 (1888).

Negotiations had taken place relative to a loan to be secured by a deed of trust covering certain land. Ultimately a smaller loan was entered into with the borrower's executing an agreement which included provisions that it would keep buildings and machinery insured to a specified amount, that the insurance policies would be transferred to the lender as additional security, and that the borrower "covenant[ed] that it w[ould] not give any voluntary lien of any character whatever on any of its buildings, machinery, or grounds so long as this debt remain[ed] unpaid." Other creditors entered judgment against the borrower. The lender sought priority over those judgment creditors. The court recited the general rule:

> The form or peculiar nature of the agreement which shall create a lien is not very material, for equity looks rather at the final intent and purpose than at the form; and if the intent appears to give, or to charge, or pledge property, real or personal, as security for an obligation, and the property is so described that the principal things intended to be given or charged can be sufficiently identified, the lien follows. *Wayt v. Carwithen,* 21 W. Va. 516 [(1883)]. [*Id.* at 794-95.]

The court held the covenant not to be a lien, saying:

> Of course this creates no lien on or pledge of any property. It is simply negative; an agreement not to do a particular thing. The creation of a lien is an affirmative act, and the intention to do such act can not be implied from an express negative. It seems to me that both of these clauses of the obligation are simply personal covenants, for the breach of which the remedy must be sought in a court of law. They create, as we have seen, no lien upon real estate, and give the plaintiff no interest therein. They simply impose a personal obligation upon the convenantor. [*Id.* at 796.]

The next case to consider such a negative covenant issue

was *Western States Finance Co. v. Ruff,* 108 Or. 442, 215 P. 501, *rehearing denied, opinion modified,* 108 Or. 455, 216 P. 1020 (1923). There a husband sold certain land. His wife did not join in the conveyance for the purpose of releasing her inchoate right of dower. The purchaser (Kaser), being desirous of obtaining a release of her interest, entered into an agreement with her. He was to pay her a specified sum two years after the execution of the agreement, at which time her deed was to be delivered. The agreement between this purchaser and the wife specified that he would make no conveyance of this land during the two year period without seeing that the sum due the wife was paid. The wife and the husband were divorced during this two year period. The purchaser conveyed the land to a third party who brought an action to determine what, if any, claim she had against the land in question. The court referred to *Knott,* which it said was "directly in point." It said the words used in the contract could not "be construed as importing a transfer or conveyance of an interest or estate in the lands as security, or for any other purpose," nor did they "express an intent to give a lien upon, or to pledge, any right or interest of Kaser in the lands as security for [the wife's] debt." *Id.* at 451. It held that the contract did not vest the wife "with a complete and present right in or to the property, in the nature of a lien or security," that "[i]t simply fixed a contingent due date for Kaser's debt to [the wife], earlier than that provided by the contract." *Id.* at 452.

The next case in the order of things is *Fisher v. Safe Harbor Realty Co.,* 38 Del. Ch. 297, 150 A.2d 617 (Sup. Ct. 1959). There the purchase price of certain real property was secured by an agreement which guaranteed payment of the purchase price and performance of the contract of sale. The contract contained a covenant "that the land . . . shall not be encumbered with or by mortgage so long as there [were] any amounts due" the seller. Other creditors obtained judgments against the buyer. In a contest between the seller and the judgment creditors the seller claimed "that he ha[d] an equitable mortgage on the land . . . created by the contracts . . . relat[ing] back to the recording date [of his contract],

antecedent to the entry of the judgments of the judgment creditors." *Id.* 301-02. Justice Wolcott "noted [for the court] that the particular provision is a negative covenant prohibiting the encumbering by mortgage of Safe Harbor's land." *Id.* at 302. The court held:

> We are of the opinion that the only provision in the contract which by the remotest possibility can be said to evince an intention to secure the purchase price with a lien on land is the covenant not to encumber the land by mortgage. As such, it is a negative covenant not to do a certain thing and not an unequivocal manifestation to secure a debt by a lien on land. [Citing cases.]
>
> We think, therefore, that the agreement before us evinces no intention to create a lien on the land of Safe Harbor as security for the payment of the purchase price of Fisher's Safe Harbor stock. In the absence, therefore, of an affirmative and unequivocal undertaking on the part of Safe Harbor to subject its lands to a lien, we must deny the imposition of an equitable lien to the detriment of subsequent judgment creditors. [*Id.* at 303.]

Equitable particularly relies upon *Coast Bank v. Minderhout,* 61 Cal. 2d 311, 392 P.2d 265, 38 Cal. Rptr. 505 (1964), and says "that the rationale of the California Supreme Court in th[at] case . . . should be adopted by this Court." In *Coast Bank* borrowers entered into a contract with a bank by which they agreed "that until all such loans and advances and all other indebtedness or liabilities to the Bank shall have been paid in full, or until 21 years following the death of the last survivor of the undersigned, whichever shall first occur, they will pay all taxes" etc. and that they would not "without the consent in writing of Bank, first had and obtained, create or permit any lien or other encumbrances (other than those presently existing and/or securing the payment of loans and advances made to them by Bank) to exist on said real property, and will not transfer, sell, hypothecate, assign, or in any manner whatever dispose of said real property, or any interest therein or any portion

thereof . . . ." The agreement then described the property in question. The borrowers conveyed the land without the knowledge or consent of the bank. Upon default by the borrowers, the bank brought an action to foreclose the equitable mortgage that it claimed was created. Justice Traynor said for the court:

> In the present case, however, plaintiff pleaded and defendants admitted by demurring and failing to answer that the parties intended to create a security interest in the property. Accordingly, the question presented is not what meaning appears from the face of the instrument alone, but whether the pleaded meaning is one to which the instrument is reasonably susceptible. [Citing authorities.] It is essentially the question that would be presented had defendants denied that the parties intended to create a security interest and plaintiff had offered extrinsic evidence to prove that they did. Such evidence would be admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible. [Citing cases.]
>
> The instrument restricts the rights of the Enrights in dealing with their property for plaintiff's benefit; it describes itself as "For use with Property Improvement Loan," it specifically sets forth the property it covers, and it authorizes plaintiff to record it. These provisions afford some indication that the parties intended to create a security interest and are clearly sufficient to support the pleaded meaning. [*Id.* 38 Cal. Rptr. 507.]

The same court seven years later held no lien was created under a similar agreement in *Tahoe National Bank v. Phillips,* 4 Cal. 3d 11, 480 P.2d 320, 92 Cal. Rptr. 704 (1971), stating:

> Plaintiff bank, which occupied the more powerful bargaining position and deliberately chose to use a standardized form providing for the assignment of

rents and a covenant against conveyances, cannot be permitted to transform this assignment into a mortgage contrary to the reasonable expectation of its borrower. On examining the terms and purpose of the assignment, we conclude that it is not reasonably susceptible of construction as a mortgage at the instance of the bank . . . . [*Id.* 4 Cal. 3d at 14, 92 Cal. Rptr. at 707.]

The court further said:

We agree with defendant's contention that the assignment cannot reasonably be construed as a mortgage and thus that extrinsic evidence, offered by plaintiff to prove the document a mortgage, is legally irrelevant and cannot support the judgment. We shall examine the purpose and terms of the assignment, and explain that it is a type of agreement commonly used with unsecured loans, that it contains no words of hypothecation, and that it includes language inconsistent with a mortgage. [*Id.* 4 Cal. 3d at 16-17, 92 Cal. Rptr. at 709.]

It pointed out, "[W]e are not dealing with homemade security instruments in which the parties labor to produce a mortgage but fall short of the legal requirements and must be rescued by a court of equity. The form used was carefully drafted to produce a security interest with incidents differing from that of a mortgage." *Id.* 4 Cal. 3d at 18, 92 Cal. Rptr. 709-10. It observed, referring to a work by Professor Hetland (Professor of Law at the University of California, Berkeley) prepared in 1970 for the continuing education of the California Bar:

If ambiguity there is, that ambiguity may be deliberate. Professor Hetland, referring to assignments similar to that at issue in the present case, states that "the instrument seems to have been designed by a group of lenders to afford the lender the option of being a secured or an unsecured creditor at the time of the debtor's default. * * *"

(CEB, § 2.38.) Thus, although the assignment primarily serves to protect unsecured loans (see fn. 6, supra), it may also be used "to lead a borrower who refuses to give a mortgage into believing he is not doing so" (CEB, § 2.25). [*Id.* 4 Cal. 3d 19-20, 92 Cal. Rptr. 711.]

It distinguished *Coast Bank.*

Hetland, *Real Property and Real Property Security: The Well-Being of the Law,* 53 Cal. L. Rev. 151, 167 (1965), in his discussion and analysis of *Coast Bank,* suggests that what the California court held was "that this form of agreement not to encumber property is either a mortgage or is a void contractual restraint on alienation *at the election of the debtor.*" (Emphasis added.)

The Arizona Court of Appeals was faced with a similar agreement in *Weaver v. Tri City Credit Bureau,* 27 Ariz. App. 640, 557 P.2d 1072 (1976). It said:

> In our opinion, the reasoning in *Coast Bank* is initially weak and is further weakened by the subsequent California decisions of *Tahoe National Bank v. Phillips,* 4 Cal. 3d 11, 92 Cal. Rptr. 704, 480 P.2d 320 (1971), and *Orange County Teachers' Credit Union v. Peppard,* 21 Cal. App. 3d 448, 98 Cal. Rptr. 533 (1971). [*Id.* at 1076.]

It pointed out that in its case it did not have two parties who "strove mightily to create a mortgage, but through inadvertence did not technically achieve their purpose so that equity must come to their rescue by imposing an equitable lien." *Id.* at 1076. Thus, it had "no hesitancy in holding that this document did not create an equitable mortgage on the real property." *Id.*

California law was applied to a virtually identical agreement in *Browne v. San Luis Obispo National Bank,* 462 F.2d 129 (9th Cir. 1972). The court said:

> Mrs. Browne obtained an unsecured loan . . . from the San Luis Obispo National Bank (Bank). She signed a promissory note and a document titled

"Assignment of Rents and Agreement Not To Sell or Encumber Real Property" covering a lot in San Luis Obispo which she owned. The Bank promptly recorded the document .... [*Id.* at 131.]

Subsequently she filed a voluntary petition in bankruptcy listing the bank as an unsecured creditor and claiming that her real estate was exempt as a homestead. The homestead exemption was granted and in due course she was discharged from all debts and claims provable against her bankruptcy estate. "Nearly two years after Mrs. Browne's discharge, the Bank brought suit in the California Superior Court to foreclose the equitable mortgage it claimed to hold on her property." *Id.* at 132. She returned to the bankruptcy court and sought an injunction against the sheriff's sale. Ultimately, the issue reached the United States Court of Appeals. It said:

The *Tahoe* document, like the document here, contained no hint of any power of foreclosure. None of the covenants purported to create a lien; its language was inconsistent with that interpretation. Given *Tahoe* and the lack of any evidence that Mrs. Browne intended to create a security interest, there can be no doubt that the Bank never obtained any mortgage or lien, equitable or otherwise, upon Mrs. Browne's property. [*Id.* at 133.]

## IV

Various authors have discussed equitable mortgages. For instance, 1 G. Glenn, *Mortgages* § 17.4 (1943), states:

At one time the idea of "equitable mortgage" or lien, was carried too far in this country — so far, indeed, that at last it became necessary to pull the reins up. It got to the point, in fact, that any sort of vague talk about "security" seemed to justify a later mortgage. In one case, for instance, a builder who got a loan agreed to give a mortgage "on one of my houses under construction," but no particular house

was mentioned, and yet this created a lien, *ex post facto,* upon the house which finally was selected as the subject of an actual mortgage. [*Id.* at 105-06.]

In a chapter on "Equitable or Irregular Mortgages" he does not discuss negative covenants, but one comment provides insight:

If, in other words, people wish to secure a debt by mortgage, they must at least make a stab at drawing up a mortgage, and they cannot say, "Well, let's play as though there were a lien." This sort of nursery game will result in nothing, even as between the parties themselves (should one later become serious about it), nor will it affect a purchaser with notice. The point should be emphasized, because all too often a youthful type of philosopher emerges from our schools with a dislike of "legalism." A gentleman of this type may do well enough in courses that touch only the fringes of our law, but he should never advise clients. We know at least this, that there is such a thing as mortgage or pledge; and if people deliberately try to dispense with the use of such a device, they cannot obtain relief, at law or in equity, that is based upon any theory of security. [*Id.* at 103-04.]

Each treatise writer has his own formulation of what constitutes an equitable lien. For example, 1 L. Jones, *Law of Mortgages of Real Property* § 225 (8th ed. 1928), states:

An equitable mortgage may be broadly defined as a transaction which has the intent, but not the form, of a mortgage, and which a court of equity will enforce to the same extent as a mortgage. There are many kinds of equitable mortgages — as many as there are varieties of ways in which parties may contract for security by pledging some interest in lands. "An agreement in writing to give a mortgage, or a mortgage defectively executed, or an imperfect attempt to create a mortgage or to

appropriate specific property to the discharge of a particular debt, will create an equitable mortgage, or a specific lien on the property intended to be mortgaged." So, an equitable mortgage will result from different forms of transactions, in which there is present an intent of the parties to make a mortgage, to which intent, for some reason, legal expression is not given in the form of an effective mortgage; but *in all such cases the intent to create a mortgage is the essential feature of the transaction. [Id. at 261-62 (emphasis added).]*

That work cites *Western Bank v. Union Bank,* 91 Md. 613, 46 A. 960 (1900), for the italicized portion of the above quotation.

Writers who have discussed negative covenants seem to be in unanimous agreement that these covenants do not create a security interest. For example, 4 *American Law of Property, op. cit.,* § 16:38 states, "The purely negative covenant not to mortgage certain property while the obligation of the owner remains unpaid seems, on the authorities, pretty clearly not to create any security interest in the promisee." Coogan, Kripke, and Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements,* 79 Harv. L. Rev. 229, 264 (1965), discusses *Coast Bank* saying that it might be taken to hold that a negative pledge clause creates an equitable mortgage which can be foreclosed by the promisee in an action against a transferee of the property. The authors note, however, "[T]he procedural and practical setting of the case greatly diminishes its force as a precedent for treating general negative pledges as Code security interests." They then go on to state, "It is still quite improbable that any court would hold that a purely negative general covenant against encumbering assets gives rise to a security interest." *Coast Bank* is likewise discussed in 2 G. Gilmore, *Security Interests in Personal Property* § 38.3 (1965), with the comment, among others, "The case is of interest not only

because of the eminence of Justice Traynor, who wrote the opinion, but also because the negative covenant here appears, for the first time in our case reports, in what can fairly be described as an institutional banking setting." *Id.* at 1011. Nevertheless, in § 38.4 Professor Gilmore states:

> Negative covenants should not, it is submitted, be allowed to operate as informal or inchoate security arrangements, even against third parties with notice. If a creditor wants security, let him take a security interest in some recognized form: mortgage, pledge, an Article 9 security interest or whatnot. If he wants protection against third parties, let him take possession of the collateral or file. Nothing is to be gained by giving a shadowy effectiveness to informal arrangements which conform to no recognized pattern. The debtor's covenant not to encumber property, like the contractor's covenant not to assign moneys to become due under his contract, should be treated, as on the whole the case law has done, as a covenant "merely personal" — good enough to give rights against the covenantor for breach, to bring an acceleration clause into play, to constitute an "event of default" under a loan agreement, but not good enough to give rights, whether they be called legal or equitable, in property. [*Id.* at 1017.]

G. Osborne, *The Law of Mortgages* § 44 at 88 (2d ed. 1970) states word for word what is found in *American Law of Property,* "The purely negative covenant not to mortgage certain property while the obligation of the owner remains unpaid seems, on the authorities, pretty clearly not to create any security interest in the promisee."

## V

With that background, we turn to the instrument in question. It is plain and unambiguous. It does nothing more than to recite that there is a debt to Equitable and that in

consideration of that debt Imbesi will not encumber or convey specified land so long as the debt remains unpaid. It will be recalled that the Court stated in *Keyworth*, 240 Md. at 305, that an equitable lien is based on specific performance of a contract to assign property as security. In *Western Bank*, 91 Md. at 621, cited by Jones, the Court said relative to an equitable mortgage, "[I]n all such cases the *intent to create a mortgage* is the essential feature of the transaction." (Emphasis in original.)

We have here no homemade security instrument in which the parties labored to produce a lien of some sort but fell short of the legal requirements and thus must be rescued by a court of equity. The form on which this agreement was placed was a printed document prepared by one of the largest banks in the State. We have no instrument which purports in any way to convey or to place a lien upon land. The agreement is barren of anything to indicate an intent to create a lien. We have nothing but an agreement *not* to do a particular thing. In the words of the West Virginia court in *Knott*, "[t]he creation of a lien is an affirmative act, and the intention to do such act can not be implied from an express negative." *Id.* 30 W. Va. at 796. We agree. Accordingly, we find no equitable lien. It follows as a consequence that the instrument with which we are here concerned creates no lien paramount to subsequent mortgages or judgment liens on the same property.

## VI

Cases are legion in Maryland to the effect that where a contract is plain in its meaning, there is no room for construction and it must be presumed that the parties meant what they expressed. Hence, in the absence of fraud, duress or mistake (none of which are claimed to exist in the present case), parol evidence is not admissible to vary or contradict the terms of a written instrument. *See, e.g., Kermisch v. Savings Bank of Balto.,* 266 Md. 557, 560, 295 A.2d 776 (1972); *Foreman v. Melrod,* 257 Md. 435, 442, 263 A.2d 559 (1970); *Rinaudo v. Bloom,* 209 Md. 1, 120 A.2d 184 (1956),

and *Markoff v. Kreiner,* 180 Md. 150, 154-55, 23 A.2d 19 (1941). The Court pointed out in *Markoff* that a "different rule would increase the temptations to commit perjury and often render instruments of little value. All prior and contemporaneous negotiations are merged in the written instrument, which is treated as the exclusive medium for ascertaining the intent of their obligations." *Id.* at 154-55. This statement was repeated in *Kermisch* and *Foreman.* It follows, therefore, that the answer to the second question is that extrinsic testimony concerning the intent of the parties is not admissible in this instance for the purpose of deciding whether the covenant not to encumber is an equitable lien paramount to subsequent mortgages or judgment liens on the same property.

> *Questions of law answered as herein set forth; costs to abide the result.*