ROBERT O. ANDERSON AND BARBARA P. ANDERSON; THE
HONDO COMPANY & SUBSIDIARIES, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 5111-85.        Filed January 26, 1989.

*James E. Bye, William S. Huff, Bruce N. Lemons,* and
*Dan A. Sciullo,* for the petitioners.

*Benjamin deLuna* and *David P. Monson,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in the
Federal income tax of petitioners Robert O. Anderson and
Barbara P. Anderson for their tax year ending October 31,
1977, in the amount of $104,263, and for their tax year
ending October 31, 1979, in the amount of $3,059,563.
Respondent determined a deficiency in the Federal income
taxes of petitioner, the Hondo Co., for its tax year ending
December 31, 1979, in the amount of $1,795,673.

Some of the issues raised by the pleadings have been
disposed of by agreement of the parties, leaving for our
decision (1) whether the Hondo Co. distributed 100,000
shares of Atlantic Richfield Co. stock to its sole share-
holder, Robert Anderson, in its tax year ending December

31, 1978, or in its tax year ending December 31, 1979, and (2) whether income from the sale in January 1979 by petitioner Robert O. Anderson, of the stock distributed to him should be attributed to the Hondo Co.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Robert O. Anderson and Barbara P. Anderson, husband and wife, were residents of Roswell, New Mexico, at the time of the filing of the petition in this case. Petitioner, the Hondo Co., is a New Mexico corporation. Its principal place of business and offices were located in Roswell, New Mexico, at the time of the filing of the petition in this case. During the tax years at issue, and at the time the petition was filed, the Hondo Co. was known as the Diamond A Cattle Co. (Diamond A or the corporation). We will refer to the Hondo Co. as Diamond A throughout the remainder of this opinion. The petition for redetermination of the deficiencies in this case was filed jointly by the Andersons and Diamond A.

Petitioners Robert O. Anderson and Barbara P. Anderson filed joint Federal income tax returns for their taxable year ending October 31, 1979, with the Internal Revenue Service in Austin, Texas. Robert O. Anderson, the principal individual litigant in this case, was the sole shareholder of Diamond A during the years in issue. Diamond A filed consolidated Federal income tax returns, on an accrual basis, with its subsidiaries for its taxable years ending December 31, 1978, and December 31, 1979, with the Internal Revenue Service in Austin, Texas.

Robert Anderson was born in April 1917 in Chicago, Illinois. He was the son of a prominent Chicago banker. After attending the University of Chicago and working for a small oil company, Mr. Anderson bought a 50-percent interest in a small refinery in New Mexico. Under Mr. Anderson's stewardship, the refinery became a successful independent oil company. In 1963, the company was merged with a corporation which would later become the Atlantic Richfield Co. (ARCO). After the merger in 1963, Mr. Anderson became chairman of the board of directors of

ARCO. He was chairman of the board of ARCO during the years at issue herein and continued in that capacity until January 1986.

While Mr. Anderson was chairman of its board, ARCO had the largest domestic oil reserves of any U.S. oil company. ARCO conducted operations in more than 25 countries around the world, including Iran, Norway, Indonesia, Brazil, Venezuela, England, and the Sheikdom of Dubai. During 1978 and 1979, ARCO's corporate headquarters were located in a two-tower office complex on South Flower Street in Los Angeles, California.

The ARCO headquarters were located in one tower of the complex while the other tower housed the southern California headquarters of the Bank of America. The main Los Angeles branch of the Bank of America was located between the two towers in the same office complex. Mr. Anderson's offices as chief executive officer of ARCO were located in the ARCO tower.

In addition to his activities in the oil industry, Mr. Anderson became involved in the agricultural industry. On January 1, 1965, Mr. Anderson organized the Diamond A Cattle Co. as a New Mexico corporation. During its existence, Diamond A owned several ranching and farming properties, including a 212,828 acre parcel of property located in southwest Texas known as the Big Bend Ranch, upon which it conducted agriculture-related activities. Diamond A also conducted a major cattle feeding operation. On June 1, 1978, Diamond A acquired all the outstanding stock of Tinnie Mercantile Co. (Tinnie) from Mr. Anderson and his two sons.[1] Tinnie operated several restaurants, a boot manufacturing business, and a jewelry manufacturing business. It was also engaged in real estate investment activities.

Mr. Anderson also engaged in, and continues to engage in, various agriculture-related enterprises through his unincorporated sole proprietorship, the South Spring Co. (South Spring). Although many employees of Diamond A performed services for South Spring, separate books of account were maintained for each entity.

---

[1]At the time of its acquisition, Tinnie had a negative net worth of just under $3.5 million.

During the years at issue in this case, Mr. Anderson was a director of Diamond A, as well as its sole shareholder. However, because of his heavy involvement in the affairs of ARCO, Mr. Anderson spent most of his time in Los Angeles, rather than at the offices of Diamond A in Roswell, New Mexico. Consequently, he had practically no involvement in the day to day operations of that corporation. A detailed record of Mr. Anderson's movements, calls, and appointments was kept by Ms. Susie Wagner, his personal secretary in Roswell.

Mr. William B. McCombs, president of Diamond A, ran the day to day operations of the corporation. Mr. McCombs was also a member of the board of directors of Diamond A. Mr. McCombs died prior to the date of trial of this case.

The vice president and treasurer of Diamond A was Mr. Jesse Link. Mr. Link was involved in the financial management of the corporation and was responsible for the correct functioning of its accounting department. Mr. Link was also a director of Diamond A. Mr. S.H. Cavin, an attorney, was the secretary of Diamond A. Mr. Cavin provided legal advice to the corporation and to Mr. Anderson, personally. He was not a director of Diamond A. Mr. Billy Wright was controller of Diamond A and head of its accounting department during the years at issue in this case.

Upon its incorporation, Mr. Anderson transferred ranches, livestock, and ARCO stock to Diamond A in exchange for all of its stock. Thereafter, Mr. Anderson, from time to time, transferred additional shares of ARCO stock to Diamond A for use as collateral by the corporation in obtaining working capital loans. By January 1978, Diamond A owned 240,000 shares of ARCO stock, all of which were pledged as collateral in connection with two primary lines of credit extended to Diamond A by the Bank of America of Los Angeles, California (the bank). In February 1978, Diamond A transferred 10,000 shares of ARCO stock to the University of Chicago as a gift, thereby reducing its ARCO stock ownership and available collateral to 230,000 shares. Throughout 1978 and 1979, Diamond A's basis in the ARCO stock it owned was $0.116 per share.

In a letter agreement, dated July 21, 1978, the bank agreed to renew, effective June 1, 1978, through May 31,

1979, the two primary lines of credit previously extended to Diamond A. Mr. McCombs, as president of the corporation, accepted the terms set out in the letter agreement by signing on behalf of Diamond A under the statement at the bottom of the letter "Approved and Accepted, THE DIAMOND A CATTLE COMPANY." He then returned an executed copy of the letter agreement to Mr. Thomas Hacking, an officer of the bank. Under the terms of the agreement, the bank extended a secured cattle and feed line of credit to Diamond A up to the amount of $8 million and a secured revolving line of credit up to the amount of $10 million.

The maximum advance available under the $8 million line of credit, which was secured by livestock, feed commodities, and accounts receivable, was 75 percent of the fair market value of such collateral. The line carried an interest rate of 1½ percent over the bank's prime rate. The $10 million line of credit was secured by a $400,000 collateral deposit account at the bank, a "negative pledge" on the Big Bend Ranch, and the 230,000 shares of ARCO stock still owned by Diamond A.[2] The maximum advance available under the $10 million line of credit, which carried an interest rate of 2 percent over the bank's prime rate, was 100 percent of the pledged deposit, 65 percent of the fair market value of the 230,000 shares of ARCO stock, and 50 percent of the fair market value of the Big Bend Ranch.[3] In addition to the above-mentioned collateral, the $8 million cattle and feed line of credit and the $10 million revolving line were both secured by a $22.5 million continuing guarantee of South Spring and Robert O. Anderson as its sole proprietor.

Under the terms of the credit arrangement between Diamond A and the bank, Diamond A was required to submit, on a monthly basis, certain documents, known as borrowing certificates. The borrowing certificates described the status of the collateral securing each line of credit as of the end of each month. The amount of available collateral, known as the borrowing base, determined the amount of

---

[2]The term "negative pledge" typically refers to a negative covenant under which a borrower agrees that he will not sell, assign, transfer, or in any manner encumber his interest in specified property.

[3]Although not incorporated in the letter agreement, according to one official of the bank, the $10 million line of credit was also cross-collateralized by the cattle securing the $8 million line of credit. However, this discrepancy is not material to our decision herein.

credit available to Diamond A. The submitted certificates were accompanied by supporting documents and schedules.

Each month, the certificates were prepared by Ms. Estie Stamper, an employee in Diamond A's accounting department, from a master form which displayed information that typically remained the same from month to month. Ms. Stamper would insert on the certificates certain information which varied from month to month. The varying information typically related to the amount of collateral securing the $8 million line of credit (i.e., livestock, feed commodities, receivables, etc.). However, the varying information occasionally related to collateral under the $10 million line of credit.

For example, the borrowing certificate for January 1978 showed that the $10 million revolving line of credit was secured by 240,000 shares of ARCO stock as of January 31, 1978. However, the borrowing certificate for February 1978 showed that the revolving line of credit was only secured by 230,000 shares of ARCO stock. This change reflected the fact that 10,000 shares had been donated by Diamond A to the University of Chicago in February 1978.

After the borrowing certificates were prepared, they were reviewed for accuracy first by Mr. Wright, controller of Diamond A, and second by Mr. Link, vice president of Diamond A, who would then sign the certificates prior to their submission to the bank. The two men would also discuss the needs of Diamond A and determine whether additional draws on both lines of credit were necessary, or whether it would be advisable to draw on the cattle line in order to pay down the revolving line which carried a higher rate of interest. Their decisions were then communicated to Ms. Stamper who would enter the appropriate figures on the certificate. If Mr. Wright was not present in the corporation's offices, the certificates would be forwarded directly to Mr. Link for review and signature. The certificates were always reviewed by at least one financial officer of Diamond A prior to their submission to the bank.

In the fall of 1978, Mr. Anderson became concerned with the widespread increase in interest rates and the level of his

personal indebtedness. Besides his $22.5 million guarantee of Diamond A's debt through South Spring, Mr. Anderson had also personally guaranteed a $3.45 million line of credit extended by First National Bank of Chicago to Tinnie Mercantile Co. In addition, the South Spring Co. and, consequently, Mr. Anderson, as sole proprietor, was indebted under a $6 million line of credit extended to South Spring by the First National Bank of Chicago.

Mr. Anderson communicated his concerns about this large amount of personal debt to the vice president of Diamond A, Mr. Link. A distribution of 100,000 shares of ARCO stock from Diamond A to South Spring, Mr. Anderson's sole proprietorship, was discussed as a possible means of reducing his personal indebtedness to the First National Bank of Chicago and providing him with increased financial flexibility. Subsequent to these discussions, Mr. Link requested Mr. Anderson's accounting and tax advisor, Peat, Marwick, Mitchell & Co. (Peat, Marwick), to investigate the income tax consequences of a distribution of ARCO stock to Mr. Anderson in 1978. The letter response from Peat, Marwick, dated October 31, 1978, pointed out that Diamond A had closed its 1977 tax year with a deficit in accumulated earnings and profits, was anticipating substantial operating losses in 1978, and at the end of its 1978 tax year, Diamond A was expected to have neither accumulated nor current earnings and profits. The letter pointed out that Mr. Anderson had a total basis in his Diamond A stock of approximately $9.2 million, while the fair market value of the 100,000 shares of ARCO stock which was being considered for distribution to Mr. Anderson was approximately $5.4 million.

Peat, Marwick in its letter advised Diamond A and Mr. Anderson that (1) under section 301(b)(1)(A),[4] the amount of any distribution is equal to the money received plus the fair market value of any property distributed, (2) that under section 301(c)(1), a distribution from a corporation to a shareholder is considered dividend income to the shareholder to the extent of the corporation's current and

---

[4]Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

accumulated earnings and profits, but if the amount of the distribution exceeds the corporation's accumulated and current earnings and profits, the excess is considered a tax-free return of capital to the extent of the shareholder's basis in the distributing corporation's stock (sec. 301(c)(2)) and (3) that any distribution in excess of both earnings and profits and the shareholder's stock basis will be treated as gain from the sale or exchange of the distributing corporation's stock (sec. 301(c)(3)(A)).

Working with these statutes and the financial statements of Diamond A, Peat, Marwick advised Diamond A and Mr. Anderson that the distribution of 100,000 shares of ARCO stock, valued at approximately $5.4 million but having a basis to Diamond A of only $11,600, would be virtually tax free to Mr. Anderson. In the letter from Peat, Marwick, it was pointed out that since Diamond A had no accumulated earnings and profits and anticipated no current earnings and profits for 1978, the distribution would not be taxable to Mr. Anderson as a dividend. The letter further stated that since the fair market value of the ARCO stock to be distributed did not exceed Mr. Anderson's basis in his Diamond A stock, there would be only a minimal capital gain to Mr. Anderson.[5] Peat, Marwick also advised Mr. Anderson that, under section 301(d)(1), his basis in the distributed stock would be equal to its fair market value at the date of distribution, but that, under the general rule of section 311(a), Diamond A would recognize no gain on the distribution of ARCO stock. Peat, Marwick's letter of advice to Mr. Anderson contained the following statement:

If you sold the ARCO stock shortly after you received it from Diamond A, there is a possibility that the Internal Revenue Service could try to tax the gain on sale of the stock to Diamond A and tax you on the constructive distribution of the proceeds, under the theory of *Court Holding Company,* 324 U.S. 331, 45-1 USTC 9215 (1945). However, as long as Diamond A had not negotiated or arranged for the sale of the stock and you were not committed to sell the stock upon receipt, such tax treatment could probably not be sustained by the Internal Revenue Service.

---

[5]Because Mr. Anderson owned some blocks of low-basis Diamond A stock and, under *Johnson v. United States,* 435 F.2d 1257 (4th Cir. 1971), a portion of the distribution had to be allocated to these shares, Peat, Marwick advised Mr. Anderson he would have a small capital gain of approximately $9,000 from the proposed distribution.

Mr. Anderson received the Peat, Marwick letter on November 2, 1978, when he returned to Roswell from his offices in Los Angeles. A copy was also forwarded to Mr. Link. After reading the letter, Mr. Anderson immediately convened a special meeting of the board of directors of Diamond A at which time he requested a distribution of 100,000 shares of ARCO stock. The minutes of the meeting, which were prepared by Mr. Cavin, state that the following two matters were discussed and resolved.

First, the board resolved that Diamond A would make a $1 million capital contribution to its subsidiary, Tinnie Mercantile Co. Second, the board approved the requested distribution and transfer of 100,000 shares of ARCO stock to Mr. Anderson's sole proprietorship, South Spring.

The minutes further recited that, because the stock was held as collateral by the Bank of America for Diamond A's $10 million line of credit, it was necessary to secure the release of the stock certificates before they could be retitled in Mr. Anderson's name. The board authorized the appropriate officers of Diamond A to contact the bank executives in charge of Diamond A's credit and request approval of the transfer so that it could be accomplished before the end of November 1978.

During the years at issue in this case, Diamond A maintained both a credit and depository relationship with the Bank of America. Mr. Hacking was the bank's account officer responsible for the management of the credit relationship. His direct supervisor was Mr. Lynn Vine, a vice president and section head at the bank. The offices of both Mr. Hacking and Mr. Vine were located in the Bank of America tower. Major decisions, such as the extension and renewal of credit or the release of collateral, pertaining to Diamond A's lines of credit with the bank were made by Mr. Vine and Mr. Hacking, but only after gaining the approval of their two immediate credit supervisors.

Although the decision-making process relating to Diamond A's lines of credit was centered at the Bank of America tower, the loan was actually accounted for at a branch of the bank located several blocks from the tower at 505 West Seventh Street (the branch, or the Seventh and Olive branch) in downtown Los Angeles. This mechanical

accounting process, known as "booking" the loan, involves the entry of the loan as an asset on the bank's records. Officers at the Seventh and Olive branch also had authority to make advances or receive payments on the lines of credit if consistent with the structure of the loan as approved by Mr. Vine and Mr. Hacking. The Seventh and Olive branch had physical custody of the property held as collateral for Diamond A's lines of credit.

Whenever property that was to be held as collateral was delivered to the Seventh and Olive branch, the branch's note department would take physical custody of the property. A three-part collateral receipt would be typed in the branch's note department. This receipt consisted of one original and two copies. The original would be given to the borrower and the two copies would be placed in a notebook that was kept separate from the collateral. Every collateral receipt issued by the branch originated with the custodian of collateral in the note department. This was true even when the receipt was ultimately prepared and issued to a borrower by someone outside the note department. Even if the collateral was brought in by someone other than the borrower, the note department would still prepare a collateral receipt and obtain the borrower's signature at a later time.

The collateral, itself, along with the appropriate security agreement, would be kept in a roll-away double-locked cabinet called a collateral truck. For example, if a person pledged his own stock as collateral in support of his loan or in support of his personal guarantee of another's loan, the stock certificates, a stock power, and a security agreement (a so-called security agreement, secured party in possession) would be placed in an envelope which, in turn, would be placed in the collateral truck. If a person pledged his own stock directly in support of another's loan, the stock and a so-called lent collateral agreement, describing the stock in detail, would be placed in an envelope which, in turn, would be placed in the collateral truck. The head of the note department (note head) and her assistant (assistant note head) were each given a key to the truck, as were two other less-senior bank employees. In order to access the truck at

any given moment, all four persons and their keys were needed.

Collateral could be released from the collateral truck and the note department under certain circumstances. Where the underlying loan was paid off, the collateral which secured such loan would be released. In addition, where a loan was secured by funds on deposit in a savings account, the savings deposit book could be released if funds in the account were to be used to pay down the underlying loan. Collateral would also be released if the officer handling a particular account requested its release. In such a situation, the note department would require a written authorization from the account officer requesting the release.

Where stock was being held as collateral, the stock could be released at an opportune time (i.e., where its market value was at a peak) so that it could be sold and the proceeds used as substitute collateral. In this latter situation, the note department would require written authorization from the owner of the shares directing that the stock be delivered to a specified broker. The broker would be required to sign for the stock to indicate his receipt of the collateral. As the stock was sold, the proceeds would be forwarded directly from the broker to the bank to be held as substitute collateral.

When any kind of collateral was released from the branch's note department, the appropriate collateral receipts, along with a written authorization of the release, would be placed in another truck which contained closed collateral receipt files. Eventually, the branch's closed collateral receipt files were boxed and shipped to a storage area where they were subsequently destroyed.

In 1978 and 1979, Al Bobier was the branch account officer at the Seventh and Olive branch in charge of Diamond A's loans. Mr. Bobier was responsible for the "booking" of Diamond A's lines of credit. Mr. Bobier's role with respect to the collateral held at the branch was only one of oversight. Mr. Bobier had no authority to negotiate the terms of Diamond A's credit relationship or the amount of collateral required by the bank.

During the years at issue in this controversy, Lana Stuart was a lending officer at the Seventh and Olive branch. She

assisted Mr. Bobier in handling the mechanics of Diamond A's credit relationship. Helen Sedgwick was the head of the note department where the loans were physically booked. Sara Conroy was assistant note head to Ms. Sedgwick. Ms. Conroy was the custodian of the collateral held at the Seventh and Olive branch. None of these persons had authority to negotiate loans or set the level of required collateral for Diamond A. Instead, only Lynn Vine and Thomas Hacking, with the approval of their credit supervisors, were authorized to set the amount of collateral that would be required of Diamond A.

During the fall of 1978, both Mr. Anderson and Bill McCombs telephoned Lynn Vine on separate occasions to request the release of 100,000 of the 230,000 shares of ARCO stock held by the Bank of America as collateral for Diamond A's $10 million revolving line of credit. On November 16, 1978, Mr. Vine and Mr. Hacking had a luncheon meeting with Mr. Anderson. The status of the collateral under the $10 million line of credit was discussed. Both Mr. Vine and Mr. Hacking considered the loan from the Bank of America to Diamond A to be overcollateralized. They, therefore, recommended to their credit supervisors that the 100,000 shares of ARCO stock be released from Diamond A's collateral.

On November 22, 1978, Mr. McCombs, the president of Diamond A, notified the corporation's board of directors that the bank had agreed to release the 100,000 shares of ARCO stock. A letter agreement (the November 28, 1978, letter agreement or the letter agreement), dated November 28, 1978, directed to Robert O. Anderson from Mr. Hacking, states the bank's agreement in the release of the ARCO stock under the following condition:

> You (Robert Anderson) have agreed not to sell, or otherwise remove those shares from The South Spring Company until such time as you have accepted an offer for the sale of the Big Bend Ranch; the proceeds of such sale will be used to pay down Diamond A indebtedness to Bank of America.

Mr. Anderson signed his name at the bottom of this letter agreement under the caption, "Agreed and Accepted." No formal pledge agreement, security arrangement, or lent collateral agreement was required by the bank.

On November 28, 1978, the bank physically released certificates representing 100,000 shares of the ARCO stock into the custody of Howard Lewis, secretary of ARCO, on behalf of Robert Anderson. The certificates had previously been obtained from the Seventh and Olive branch, where they had been held as collateral, and had been brought to the Bank of America tower. The release of the shares to Mr. Lewis was evidenced by a receipt signed by Mr. Lewis for Robert O. Anderson. Mr. Lewis then arranged for the transfer of legal ownership of the shares from Diamond A to Mr. Anderson.

Several steps were taken as part of the transfer to Mr. Anderson. First, the certificates representing the 100,000 shares were surrendered to ARCO. ARCO then issued 10 certificates in the name of Robert O. Anderson, each dated November 30, 1978, and each representing 10,000 shares of ARCO stock. Second, in accordance with an interoffice memorandum dated December 5, 1978, from Mr. Link to the accounting departments of Diamond A and South Spring, the 100,000 shares were removed from Diamond A's books as a dividend and picked up on the books of South Spring as of November 30, 1978. Finally, because of Mr. Anderson's position as chairman of the board of ARCO, a publicly owned corporation, he was required to file a "Form 4 — Statement of Changes in Beneficial Ownership of Securities" with the Securities and Exchange Commission. The form, which was prepared under the supervision of Mr. Cavin, reported that, on November 30, 1978, Mr. Anderson ceased to own 100,000 shares of ARCO stock indirectly through Diamond A and, instead, became the direct owner of those shares. Diamond A was not liquidated following the distribution of ARCO stock to Mr. Anderson.

On December 5, 1978, after the shares had been retitled in Mr. Anderson's name, they were returned to the Bank of America tower by Mr. Lewis. Two junior officers of the bank, W.R. Strickley from account administration and Richard Condie from corporate finance, signed a receipt acknowledging the bank's receipt of the certificates. The bank's tower offices had no vault or other facility in which to hold the returned shares. The Bank of America branch located between the two towers did have such facilities.

However, if the certificates were left with this branch, a formal collateral or safekeeping arrangement would have been required.

In order to avoid excess paperwork, Mr. Strickley and Mr. Condie, along with Lynn Vine, transported the certificates to the Seventh and Olive branch where the 130,000 remaining shares of ARCO stock, titled in Diamond A's name, continued to be formally held as collateral for the corporation's $10 million line of credit. A general form receipt, as opposed to a collateral form receipt, was executed by Helen Sedgwick to acknowledge receipt of the shares by the branch's note department.

Although the ARCO stock had been formally released and legal title had been transferred from Diamond A to Robert Anderson, the corporation and the bank still treated the shares as security for the $10 million line of credit on their records. Diamond A included the 100,000 shares in its borrowing base on the borrowing certificates for the months ending November 30, 1978, and December 31, 1978. Officers of both Diamond A and the Bank of America reviewed the monthly borrowing certificates submitted by the corporation. Neither Diamond A nor the bank made any correction to the entry on the November and December 1978 borrowing certificates. On the borrowing certificate for January 1979, the 100,000 distributed shares are not included in the borrowing base.

The 100,000 shares were also treated as securing Diamond A's $10 million line of credit in the notes and supporting documents used by Peat, Marwick in the preparation of the corporation's yearend balance sheet. On January 2, 1979, Peat, Marwick submitted a standard form to the Bank of America upon which the bank was asked to indicate the status of Diamond A's credit and depository relationships. The form, which was completed by a Bank of America officer, indicates that 240,000 shares of ARCO stock were pledged as collateral for the $10 million line of credit.[6]

In a second letter, on Diamond A stationary and also dated January 2, 1979, the bank was asked to confirm that

---

[6]The 240,000 shares consisted of 130,000 shares still held pursuant to the original loan agreement between Diamond A and the bank, 100,000 shares formally released pursuant to the letter agreement between the bank and Mr. Anderson, and 10,000 shares which had been released and transferred as a gift to the University of Chicago nearly a year earlier.

it had custody of 230,000 shares of ARCO stock. Although the total shares were broken down between shares owned by Diamond A (130,000) and shares owned by Mr. Anderson (100,000), no effort was made to distinguish between those shares which were being held as collateral and those shares which were not being held as collateral.

A confirmation letter dated March 8, 1979, drafted by Peat, Marwick and approved by the officers of Diamond A, contained the following assessment of the status of the distributed shares:

11. Management also represents that:

a. The distributions of 100,000 shares of Atlantic Richfield Company (ARCO) common stock from the Company to the sole stockholder (as approved by a Special Meeting of Directors on November 2, 1978) was considered a return of capital to the sole stockholder and therefore is treated as such on the balance sheet.

b. Subsequent to December 31, 1978 various verbal discussions with the Bank of America took place whereby the Bank agreed to release as collateral for the Bank's lines of credit, the ·100,000 shares of ARCO stock referred to in 11A above. This release allowed the sole stockholder to sell the stock and dispose of the proceeds as he deemed appropriate.

Each officer of Diamond A, including the president, Mr. McCombs, the vice president and treasurer, Mr. Link, and the controller, Mr. Wright, reviewed the draft letter. Each of them then signed his name to indicate his belief that the representations contained in this assessment were correct.[7] Peat, Marwick relied on this letter in the preparation of the corporation's balance sheet.

Based on the representations made to Peat, Marwick by officials of the bank and Diamond A, the corporation's yearend 1978 balance sheet, which was prepared for internal use by Diamond A and external use by creditors, treated the 100,000 shares of ARCO stock as collateral for the $10 million line of credit. Note 2 of the balance sheet contained the following description of the collateral which secured the $10 million line of credit:

---

[7]A copy of the letter agreement between Mr. Anderson and the bank was apparently used by a Peat, Marwick accountant in the preparation of Diamond A's balance sheet. The copy of the letter agreement contains a handwritten notation, dated Feb. 22, 1979, indicating that Mr. Link told the accountant that the 100,000 shares distributed to Mr. Anderson were still pledged as security for Diamond A's debt.

(a) Pledge of Atlantic Richfield Company (ARCO) common stock (advance limited to 65% of market value). At December 31, 1978, the Company had 130,000 shares of ARCO common stock, pledged as security (see note 12). In addition, 100,000 shares of ARCO common stock owned personally by the sole stockholder were also pledged.

(b) Pledge of first deed of trust on the Big Bend Ranch (advance limited to 50% of appraisal satisfactory to bank).

(c) No new liens except to bank without prior bank approval.

(d) Guaranteed by The South Spring Company (proprietorship of sole stockholder).

The treatment by the bank and Diamond A of the 100,000 shares of ARCO stock as collateral for Diamond A's $10 million line of credit continued into 1979 even after the shares had been sold.

In late December 1978, while vacationing in Alaska, Mr. Anderson became alarmed at the volatile situation developing in Iran and the effects this situation might have on the oil industry in general and the value of ARCO stock specifically. Shortly after returning to Los Angeles, Mr. Anderson finalized his plans to sell the 100,000 shares of ARCO stock that had been distributed to him in November, and apply the proceeds to reduce his indebtedness to the First National Bank of Chicago. He notified Mr. Cavin, his attorney, and also called Lynn Vine on January 3, 1979, to inform the bank of his desire to sell the ARCO stock.

By letter, dated January 5, 1979, addressed to Mr. Hacking at the Bank of America, Mr. Cavin confirmed Mr. Anderson's desire and forwarded another letter, also dated January 5, 1979, from Mr. Anderson requesting the delivery of the 100,000 shares to a Los Angeles branch of E.F. Hutton & Co. The letter from Mr. Anderson authorized the bank to open a personal account at the bank in which the proceeds from the stock sale were to be deposited.[8] The bank subsequently delivered the shares to E.F. Hutton. An undated stock power empowering E.F. Hutton to sell the 100,000 shares was also transmitted to the E.F. Hutton office.

In a letter dated January 17, 1979, addressed to Mr. Bobier at the Seventh and Olive branch of the bank, E.F.

[8]On Jan. 10, 1979, Mr. Anderson filed a Form 144, "Notice of Proposed Sale of Securities," with the Securities and Exchange Commission notifying the Commission of his intention to sell the 100,000 shares of ARCO stock.

Hutton acknowledged its receipt of the 100,000 shares of ARCO stock. The letter further stated that:

> In consideration thereof, we agree to pay to you the proceeds of the sales as follows:
>
> 37,800 shs settlement 1/17/79 vs $2,151,064.37
> 2,500 shs settlement 1/18/79 vs $ 141,949.12
> 24,000 shs settlement 1/19/79 vs $1,374,611.20
>
> We also guarantee to pay to you the proceeds from the sale of the remaining 35,700 shares upon their settlement, along with a copy of confirmation, or return to you by February 16, 1979, the unsold portion of these shares.
>
> These instructions cannot be changed or cancelled unless confirmed by your bank.

The stock was actually sold through E.F. Hutton during an 8-day period beginning on January 10, 1979, and ending on January 18, 1979, for a net amount of $5,695,361. The sale was recorded on the books of South Spring on January 31, 1979. In accordance with Mr. Anderson's January 5, 1979, letter, savings account No. 204-4182 was opened in his name at the Seventh and Olive branch and the sales proceeds were deposited in this account.

If a savings account was used as collateral for a loan booked at the Seventh and Olive branch, the branch's note department would take custody of the savings receipt book. When deposits were made to this account, the note department would make any necessary deposit notations in the account passbook. In order to prevent withdrawal of amounts from a savings account that was being held as collateral, the note department would notify the savings department that a hold, in the appropriate amount, had been placed on the account. The appropriate amount of the hold in question was determined by a branch loan officer, such as Mr. Bobier. Although tellers on the counter would be bound by any hold and, therefore, could not allow withdrawals from an account being held as collateral, branch loan officers could override the hold.

During the period beginning January 17, 1979, and ending January 25, 1979, the bank received four installments of stock sale proceeds, totaling approximately $5,695,361, from E.F. Hutton and deposited such amounts in Mr. Anderson's account. Sara Conroy, assistant note

head at the Seventh and Olive branch, entered the amount of each deposit to Mr. Anderson's account in a savings account passbook and placed her initials next to each entry. The passbook was then placed in the collateral drawer.

On January 30, 1979, subsequent to the sales and deposits, Mr. Wright called Mr. Bobier and requested a copy of the savings account passbook so that he could record the transactions on the books of South Spring. In response to this request, on January 31, 1979, Mr. Bobier sent a photocopy of the passbook and several copies of the sales transaction slips from the sale of the 100,000 ARCO shares to Mr. Wright. The letter accompanying these copies read as follows:

In accordance with our telecon yesterday, I am pleased to send a photocopy of the Savings Receipt Book *held in collateral* and several copies of sale transaction slips from E.F. Hutton & Co. relating to the sale of 100,000 shares of Arco stock for Mr. Anderson totalling $5,695,361.30. If you have any questions, please give me a call. [Emphasis supplied.]

On January 23, 1979, Ms. Conroy, acting on the belief that the proceeds of the stock sale were to be held as substitute collateral for the released stock, placed a hold on the $2,151,064.37 which had been deposited in Mr. Anderson's account. She increased this hold amount to approximately $5,695,361, the entire amount in Mr. Anderson's account, on February 2, 1979. Without Ms. Conroy's knowledge, on February 1, 1979, Mr. Anderson's account was charged in the amount of $5,695,350. This entire amount had been wire-transferred to the First National Bank of Chicago and was used to pay off the personal indebtedness of Mr. Anderson to that bank.

Officers of the bank had originally expected that the Big Bend Ranch would be sold by January 1979, and that the proceeds from this sale would be used to reduce Diamond A's indebtedness under the $10 million revolving line of credit. This expectation was communicated to Mr. Anderson in the letter agreement dated November 28, 1978, and to Diamond A in a separate letter dated December 7, 1978. As of February 1979, the Big Bend Ranch had not been sold. In late February 1979, Diamond A sold 123,500 of the 130,000 shares of ARCO stock which had remained titled in

its name for approximately $7,467,800. The net proceeds from this sale were used to reduce the outstanding balance on the note payable to the Bank of America under Diamond A's $10 million line of credit.

On their joint return for their tax year ending October 31, 1979, Mr. and Mrs. Anderson treated the distribution of ARCO stock worth approximately $5.4 million, as a tax-free return of capital to the extent of their basis in Diamond A stock. The amount in excess of this basis, $9,042, was reported as a long-term capital gain. The Andersons also reported, as short-term capital gain, the difference between the fair market value of the ARCO stock at the time it was distributed in November 1978, and its fair market value at the time it was sold in January 1979. On its return for its tax year ending on December 31, 1979, Diamond A reported a gain of $7,453,111 from the sale of the 123,500 shares of ARCO stock that had remained titled in its name. However, it did not report any gain from the sale of the 100,000 shares that had been retitled in Mr. Anderson's name.

In his statutory notice of deficiency directed to Diamond A Cattle Co., respondent determined that:

(a) You realized a long-term capital gain of $5,672,145 from the sale of 100,000 shares of ARCO stock during the taxable year 1979 that is not reported on your income tax return. Therefore, your taxable income is increased $5,672,145.

In his statutory notice of deficiency directed to Robert and Barbara Anderson, respondent determined that:

(a) The $5,695,361 you received from Diamond A Cattle Company, was a taxable dividend under Sections 301 and 316 of the Internal Revenue Code. Since this amount was not reported on your income tax return for the fiscal year ended October 31, 1979, your taxable income is increased $5,695,361. See related adjustment (b)(3), below.

\*      \*      \*      \*      \*      \*      \*

(b)(3) Fiscal year ended October 31, 1979 — Since the gain from the sale of certain ARCO stock has been taxed as ordinary income at adjustment (a) above, the $301,611.00 shown on your return for the fiscal year ended October 31, 1979 as short-term capital gain from the sale of this stock, and the $9,042.00 shown on this same return as long-term capital gain, resulting from the distribution of this stock from Diamond A Cattle Company, are reversed in full. Accordingly, your capital gains and losses are as recomputed at Exhibit A and your taxable income for the fiscal year ended October 31, 1979 is decreased $301,138.00.

By an amendment to answer, respondent in the alternative alleged that in substance the distribution of the ARCO stock occurred in January 1979.

OPINION

The first issue is whether the sale of 100,000 shares of ARCO stock in January 1979 was, in substance, made by Diamond A and the proceeds distributed to Robert Anderson in February of 1979. If we decide that the January stock sale was, in substance, made by Robert Anderson, we must then decide whether the ARCO stock was, in substance, distributed to Mr. Anderson in January 1979 rather than November 1978.

Respondent argues that whenever an ongoing corporation makes a nonliquidating distribution of appreciated property, income from a subsequent shareholder sale of the distributed property should be imputed to the corporation if the distribution is motivated primarily by tax-avoidance reasons rather than valid business purposes, if an immediate shareholder sale of the distributed property is expected, and if a ready market exists for the distributed property so that no post-distribution activity is necessary to effectuate the sale (other than placing the distributed property with the appropriate selling agent). Respondent contends that all these factors are present in the instant case and, therefore, the income imputation doctrine should be applied.

During the years at issue in this case, corporate distributions of appreciated property did not result in gain to a distributing corporation except in certain limited circumstances.[9] Secs. 311 and 336; *General Utilities & Operating Co. v. Helvering,* 296 U.S. 200 (1935). However, this general rule did not prevent a corporation from being charged with the gain inherent in distributed property in certain circumstances where such property was sold after distribution.

In *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), the Supreme Court reinstated a Tax Court holding which had imputed the gain from a subsequent sale of

---

[9]In contrast, under the Internal Revenue Code of 1986, corporations are now required to recognize gain on the distribution of appreciated property except in certain limited circumstances. Secs. 311 and 336, as amended by sec. 631(a) and (c), Tax Reform Act of 1986, 100 Stat. 2269.

distributed property to the distributing corporation. The distributed property, an apartment house, was the sole asset of the corporation which had only two shareholders, husband and wife. Four months prior to the distribution, negotiations began for the sale of the apartment building to the lessees of the property. An oral agreement was reached, but when the parties met to reduce their agreement to writing, the corporation's attorney advised the purchaser that the sale could not be consummated as structured because the corporation would be forced to pay tax on the sales proceeds. However, the next day, the corporation distributed the apartment building to its two shareholders as a liquidating dividend. The sale was then consummated as planned except that the shareholders were substituted as vendors when the sales contract was drafted. A $1,000 downpayment, which had previously been paid to the corporation, was applied against the purchase price.

On these facts, this Court held that the apartment building had, in substance, been sold by the corporation and, therefore, the income from the sale should be imputed to the corporation. The Circuit Court of Appeals reversed after it found that the corporate sale had been canceled and the shareholder sale was unrelated to the predistribution negotiations. However, the Supreme Court concluded that the factual inferences drawn by this Court were supported by the record and stated that:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [324 U.S. at 334; fn. ref. omitted.]

The broad language contained in *Commissioner v. Court Holding Co., supra,* has been the basis for much litigation. In order to dispel some of the confusion as to the scope of its imputation of income doctrine, the Supreme Court

revisited this area in *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950).

In *Cumberland*, a closely held corporation had been engaged in the business of generating and transmitting electrical power. When it became clear the corporation could no longer do so competitively, the shareholders offered to sell their stock to the corporation's chief competitor. The competitor refused to buy the corporation's stock but offered to buy from the corporation its transmission and distribution equipment. The corporation refused the purchase offer because it would be forced to pay a corporate level tax on the proceeds. However, the corporation's shareholders did offer to acquire the equipment through distribution and then sell to the competitor. This offer was accepted. The corporation distributed the equipment in partial liquidation, the corporation's remaining assets were sold, the corporation was dissolved, and the shareholders conveyed the equipment to the corporation's competitor.

On these facts, the Court of Claims found that the sale was made by the shareholders rather than the corporation despite the presence of a tax-avoidance motive. The ruling was based, in part, on a finding that the corporation never intended to make the sale itself, and that the corporation's liquidation and dissolution were genuine. The Supreme Court accepted the lower court's findings of fact and, therefore, affirmed its judgment. The court concluded that the presence of a tax-avoidance motive was not particularly relevant. Instead, it placed importance on the finding that the liquidation and dissolution had been genuine. For example, after reiterating its holding in *Commissioner v. Court Holding Co., supra*, the Supreme Court stated in *United States v. Cumberland Public Service Co., supra*, that:

This language does not mean that a corporation can be taxed even when the sale has been made by its stockholders following a genuine liquidation and dissolution. While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. The corporate tax is thus aimed primarily at the profits of a going concern. * * * [*United States v. Cumberland Public Service Co., supra* at 454. Fn. ref. omitted.]

In the instant case, where there was no liquidation following the distribution of ARCO stock, respondent contends that a simple factual inquiry as to who, in substance, sold the ARCO stock would be improper. Instead, respondent contends that we must apply a multifactored test assembled from the various decisions of this Court and the courts of appeals.

In *United States v. Lynch*, 192 F.2d 718 (9th Cir. 1951), cert. denied 343 U.S. 934 (1952), a closely held corporation, which was in the business of growing, warehousing, and marketing fresh fruit, declared a dividend in kind consisting of approximately 22,000 boxes of apples. The corporation's shareholders entered into a contemporaneous agreement to allow the corporation to sell the apples and remit to them the net proceeds (the sales price less the costs of washing, packaging, and storing the apples). Because a ready market existed, no sales negotiations were necessary and the apples, which were never actually removed from the corporation's warehouses, were sold within 2 months of the dividend declaration.

Although the corporation was liquidated within 2 months of the dividend declaration, the Ninth Circuit Court of Appeals analyzed the case as if the dividend was a nonliquidating distribution of inventory and concluded that the sales proceeds should be imputed to the corporation. The court noted that the dividend was declared with the expectation that the distributed property would be sold immediately, the shareholders intentionally used the corporate agency as a vehicle to effectuate the sale, and the sales occurred in essentially the same manner they would have, had no dividend been declared. All of these facts indicated that the sole motive for the dividend was tax avoidance. In reaching its conclusion, the Ninth Circuit placed great importance on the finding that the dividend was a distribution from a going concern. Despite the fact that in *United States v. Lynch, supra*, it was found that the corporation actually participated in the sale, albeit on behalf of the shareholders, respondent urges us to consider the *Lynch* case as supporting his position that all nonliquidating distributions and sales fall into a separate category requiring closer scrutiny.

Other cases which respondent cites in support of his position are *A.B.C.D. Lands, Inc. v. Commissioner,* 41 T.C. 840 (1964), and *Bush Bros. & Co. v. Commissioner,* 73 T.C. 424 (1979), affd. 668 F.2d 252 (6th Cir. 1982). In *A.B.C.D. Lands, Inc.,* we were faced with a situation in which a closely held corporation made a nonliquidating distribution of the crops it received from tenant farmers under several sharecropping arrangements. The crops were subsequently sold or pledged, on behalf of the shareholders, by a local independent agent who regularly performed the same functions on behalf of the corporation. Respondent sought to impute the proceeds from these transactions to the corporation despite an apparent lack of corporate involvement in the actual sales or pledges.

During our consideration of the case, it became clear that the shareholders would have had to utilize, at least informally, the corporate vehicle in order to effectuate the sales transactions under Federal farming regulations. However, we did not base our decision to impute the sales proceeds on this minimal corporate involvement. Instead, we concentrated on several different factors.

We noted that the distribution was effectuated by simply reissuing, in the names of the corporation's shareholders, the warehouse receipts that had originally been issued by a local independent warehouse in the name of the corporation. In addition, both the corporation and its shareholders fully expected that the crops would be sold or pledged immediately following distribution. Finally, a ready market for the crops existed so that no sales negotiations would be necessary. In imputing the sales proceeds to the corporation, we stated that:

Upon consideration of all the circumstances involved, it is clear that we have before us an attempt by a going concern to avoid the corporate income tax on the sale of its inventory by the annual ritual of a paper transfer of such inventory to its shareholders, followed closely by a sale of such inventory in the ordinary course. [*A.B.C.D. Lands, Inc. v. Commissioner, supra* at 851. Citations omitted.]

In holding that the sale was in substance made by the corporation, we relied on a multifactored test.

We again had before us the consequences of an in-kind distribution by an ongoing corporation followed closely by a

shareholder sale in *Bush Bros. & Co. v. Commissioner,* *supra.* In that case, the distributed property consisted of executory or "open" contracts for the delivery of navy beans.[10] The contracts had been purchased from bean producers by a family owned corporation in its efforts to maintain an adequate inventory of the navy beans it used in the manufacture of certain food products. The dividend distribution was effectuated by distributing to the shareholders the bills of sale covering beans which had been paid for but not yet delivered. Immediately following the distribution, the shareholders sold the beans back to the producer at a profit. The Commissioner argued that this profit should be imputed to the corporation.

In a Court-reviewed opinion, this Court agreed with the Commissioner based, in part, on the following factors: (1) Control of the corporation was concentrated in a small group of family members who were also the officers of the corporation; (2) in-kind dividend distributions were unanimously approved of by the board of directors at the urging of the corporation's president who also coordinated its bean purchase program; (3) the frequency of the dividends increased over time negating the corporation's claim that the in-kind distributions were merely the result of inadvertent overstocking by the corporation; (4) the dividends were motivated primarily by tax-avoidance purposes rather than any substantive business purpose; (5) each distributed bill of sale contained a preprinted transfer clause which enabled the shareholders to quickly dispose of the beans; and (6) under the terms of an informal agreement between the corporation and the producer, the producer was expected to repurchase the beans from the shareholders immediately following the distribution.

Because of the informal agreement for repurchase, we were not dissuaded from our conclusion by the absence of a ready market for the beans. Nor did the lack of direct and significant corporate participation in sales negotiations prevent us from imputing the bean sale proceeds to the corporation. We concluded that:

---

[10]The contracts specified quantity, quality, and price but did not specify the date of delivery. Therefore, they were termed "open contracts."

Motivated primarily by tax avoidance and without any substantial business purpose, petitioner, through its officers and directors planned and carried out dividends in kind which it expected to be immediately sold. Then, indirectly, petitioner greatly influenced the sale of those dividends leaving little or no option upon which the shareholders could exercise their independent judgment. These activities are not among those intended by section 311(a). Therefore, the income will be imputed to petitioner. [*Bush Bros. & Co. v. Commissioner, supra* at 437. Citations omitted.[11]]

Based upon the foregoing cases, respondent urges that we evaluate the nonliquidating distribution and subsequent sale in the present case under his multifactored test and impute the proceeds from the sale of the distributed ARCO stock to Diamond A. In support of his contention, respondent argues that: (1) The nonliquidating distribution was primarily motivated by Mr. Anderson's desire to avoid both corporate and individual income taxes; (2) the nonliquidating distribution served no substantive business purpose and was, in fact, detrimental to Diamond A's financial health; (3) the immediate sale of the distributed ARCO stock must have been contemplated since Mr. Anderson intended to use the proceeds to reduce his personal indebtedness; and (4) the New York Stock Exchange presented a ready market for the sale of ARCO stock so that the only action required by Mr. Anderson was to transmit the shares to the broker, E.F. Hutton.

Even if we assume that the enumerated factors are present in the instant case, we do not accept respondent's conclusion that their presence justifies the application of the income imputation doctrine. In each case cited by respondent in support of his multifactored test, an additional crucial element was present which is absent in the instant case. In each case where the multifactored test was applied and the sales income was imputed, the distributed property was either the corporation's stock in trade, property properly included in the corporation's inventory at the end of the year, property held primarily for sale to customers in

---

[11]In a concurring opinion, Judge Tannenwald agreed with the majority that the gain from the sale should be imputed to the corporation. However, he based his decision on his belief that the corporation had participated sufficiently in the sales. Five judges joined in Judge Tannenwald's concurring opinion. The Sixth Circuit, in affirming our holding, agreed with Judge Tannenwald's assessment of the facts. *Bush Bros. & Co. v. Commissioner,* 668 F.2d 252, 255 (6th Cir. 1982), affg. 73 T.C. 424 (1979).

the ordinary course of the corporation's business, or a substitute/surrogate for one of the above.

In *United States v. Lynch,* 192 F.2d 718 (9th Cir. 1951), the corporation distributed its inventory. In *A.B.C.D. Lands, Inc. v. Commissioner,* 41 T.C. 840 (1964), the corporation distributed property it held primarily for sale to customers in the ordinary course of its business. In *Bush Bros. & Co. v. Commissioner,* 73 T.C. 424 (1979), affd. 668 F.2d 252 (6th Cir. 1982), the corporation distributed bills of sale which were mere substitutes for the raw materials inventory they represented. Cf. *Arkansas Best Corp. v. Commissioner,* 485 U.S. __ (1988) (61 AFTR 2d 88-655, 88-1 USTC 9210), and *Corn Products Refining Co. v. Commissioner,* 350 U.S. 46 (1955).

It is apparent from these cases that, if the property had been genuinely sold by the distributing corporation, the proceeds would have been taxed to the distributing corporation as the operating profits of an ongoing business. The proceeds from an immediate shareholder sale of this same property were imputed to the corporation, even in the absence of direct involvement by the corporation in the sales negotiations, in order to prevent an obvious avoidance of corporate tax on these operating profits. *United States v. Lynch, supra* at 720; *A.B.C.D. Lands, Inc. v. Commissioner, supra* at 851; and *Bush Bros. & Co. v. Commissioner, supra* at 437. This action was consistent with the Supreme Court's statement in *United States v. Cumberland Public Service Co.,* 338 U.S. at 455, that the corporate tax is aimed primarily at the profits of a going concern.

However, where the property distributed is not inventory or similar to inventory, the same potential for blatant tax avoidance and manipulation is not present. Therefore, a more relaxed test is appropriate, regardless of whether the corporation is liquidated following the distribution. We hold that, in situations where a sale of the distributed property at the corporate level would not produce the type of operating profits which arise in the normal course of everyday business, a factual finding that the corporation, in substance, sold the distributed property is essential to the

successful invocation of the income imputation doctrine.[12]

Factors such as tax-avoidance motives, lack of business purpose, existence of a ready market, and expectation of immediate sale may aid the Court in reaching its factual determination. However, only if the corporation in fact participated in the sales transaction, by negotiation, prior agreement, post-distribution activities, or participated in any other significant manner, can the sales proceeds be imputed to the corporation. *Hines v. United States,* 477 F.2d 1063, 1069 (5th Cir. 1973). As pointed out by the Fifth Circuit in *Hines v. United States, supra* at 1070, "Any other result would unfairly charge the corporation with a tax liability for a transaction in which it had no involvement or control."

In the instant case, the 100,000 shares of ARCO stock distributed to Robert Anderson were not inventory in the hands of Diamond A. If the stock had been genuinely sold by Diamond A, the sale would surely have produced capital gain rather than the operating profits of an ongoing business.[13] *Arkansas Best Corp. v. Commissioner, supra.* Although the stock had been pledged by the company in order to finance its business operations, it was not such an integral part of Diamond A's inventory purchase system that it can properly be seen as some sort of surrogate for Diamond A's actual inventory. Thus, in the instant case, we will determine only whether there was sufficient corporate participation in the subsequent sale to justify a factual finding that Diamond A, in substance, sold the ARCO stock.

On November 2, 1978, the board of directors of Diamond A approved a resolution authorizing the distribution of 100,000 shares of ARCO stock to the corporation's sole shareholder.[14] The distribution was subject only to the

---

[12]We note that our holding in this case is completely consistent with the regulations which make no distinction between liquidating and nonliquidating distributions and simply state that, "the proceeds of the sale of property in form made by a shareholder receiving such property in kind from the corporation may be imputed to the corporation if, in substance, the corporation made the sale." Sec. 1.311-1(a), Income Tax Regs.

[13]Respondent admitted as much in his statutory notice of deficiency sent to Diamond A in which he charged the company with $5,672,145 in long-term capital gain from the sale of the 100,000 shares of ARCO stock.

[14]Respondent contends that this meeting, in fact, never took place, and that petitioners fabricated the meeting so that the form of the transaction would comport with their version of events. Because we find that Mr. Anderson, in substance as well as form, sold the distributed ARCO stock, we need not address this contention.

condition that the Bank of America agree to release the stock from the collateral base which secured Diamond A's loans. Respondent does not contend that the ARCO stock was released and then repledged or somehow "put up" as collateral for Diamond A's debts by Mr. Anderson in his individual capacity. Rather, respondent's position, as we understand it, is that the distributed ARCO stock was never truly released from collateral in November 1978, and that this alone shows significant corporate participation in the subsequent sale.[15] There is some documentary and testimonial evidence tending to support respondent's position that the stock was never truly released from Diamond A's collateral base.

For example, the monthly borrowing certificates, which Diamond A was required to submit to the bank, consistently include the stock in the collateral base of the $10 million line of credit. There is no break or change in these certificates which would indicate that the shares were released and then repledged or somehow "put up" by Mr. Anderson for Diamond A's loans. Furthermore, two of petitioners' witnesses testified that the inclusion of these shares on the borrowing certificates was incorrect, not because the ARCO stock was not pledged as collateral, but only because collateral, which was not actually owned by Diamond A, should never have been listed on the certificates. An inference could be drawn from this testimony that the stock never ceased to be owned by Diamond A and never was released by the bank from the collateral base which secured Diamond A's loans.

However, in our view the record is replete with documentary and testimonial evidence indicating that the ARCO stock was truly released by the Bank of America from Diamond A's collateral base. For example, in the November 28, 1978, letter agreement between Mr. Anderson and the bank, the bank clearly agrees to release the ARCO stock in return for Mr. Anderson's promise not to sell or otherwise

---

[15]Respondent does not elaborate on this theory. However, because we will undoubtedly have to decide whether the distributed stock was, in fact, released from Diamond A's collateral base in the context of issue two, we do so here in order to fully address all of respondent's contentions.

remove the stock from his individual proprietorship.[16] Both Mr. Vine and Mr. Hacking, the bank officers in charge of Diamond A's lines of credit, testified at trial that the shares had been released from Diamond A's collateral base in accordance with their recommendation.

Subsequent to the board of directors meeting, the shares were physically released and retitled in Mr. Anderson's name. The collateral receipts representing the shares, which had been issued when the stock was formally held in the corporation's name, were returned to the bank. Although the balance sheet and work papers prepared by Peat, Marwick could support an inference that the ARCO stock was never released from Diamond A's collateral base, these documents simply indicate that the stock was pledged as collateral for Diamond A's loans and could, therefore, just as easily support an inference that the ARCO stock was pledged by Mr. Anderson in his individual capacity. In short, the record before us simply does not support respondent's contention that the shares were never truly released from Diamond A's collateral base, but rather, the weight of the evidence is that they were released from Diamond A's collateral base and we so hold.

There is no evidence indicating significant or even minimal corporate involvement, either before or after the distribution, in the sale of the distributed stock. After the distribution and retitling of the ARCO stock, the bank clearly held the stock on behalf of Mr. Anderson. The authorization to transmit the stock to E.F. Hutton for subsequent sale came from Mr. Anderson alone. Authorization from Diamond A for the sale was neither sought nor given. Diamond A did not participate in any sales negotiations since no such negotiations were necessary. The shares were sold on a public market to unknown buyers.

Admittedly, officers of Diamond A performed some minor tasks in connection with the stock sale. For example, Mr. Link looked into the tax consequences of an immediate sale following distribution. Mr. Cavin wrote the cover letter which transmitted Mr. Anderson's authorization for the sale

---

[16]As explained later, this promise not to sell the ARCO stock on which respondent bases much of his argument is, by its very nature, inconsistent with his claim that the stock continued to be collateral for Diamond A's debts.

of the ARCO stock. Mr. Wright made the accounting entries necessitated by the sale on the books of South Spring. However, these activities were all performed either in their capacity as employees of Mr. Anderson individually or Mr. Anderson's sole proprietorship, South Spring. In any event, they fall far short of the type of significant involvement which would support a finding that Diamond A, in substance, sold the ARCO stock.

Because we detect no significant involvement on the part of Diamond A in the sale of the distributed stock, we find that the 100,000 shares of ARCO stock were, in substance as well as form, sold by Robert Anderson. Having decided the first issue in favor of petitioners, we now address the second issue of whether the distribution of ARCO stock took place in Diamond A's tax year which ended on December 31, 1978, or its tax year which ended on December 31, 1979.

Petitioners point to several factors in support of their contention that the distribution did, indeed, take place in 1978 when Diamond A had no accumulated or current earnings and profits. First, according to petitioners, the ARCO stock was unconditionally released from Diamond A's collateral base in November 1978. Second, it is petitioners' position that the November 28, 1978, letter agreement between Mr. Anderson and the bank did not provide the bank with a security interest in the released shares. In addition, petitioners note that the retitling and transfer of the 100,000 shares into Mr. Anderson's name on the books of the Atlantic Richfield Co., which admittedly took place in November 1978, constitutes prima facie evidence under California law that Mr. Anderson became the legal owner of those shares in 1978.

Finally, petitioners provide the following facts in support of their contention that the November 1978 distribution should be respected for tax purposes: (1) According to the books of account of both Diamond A and South Spring, the transfer took place in November 1978; (2) the bank had custody of the stock on behalf of Mr. Anderson not Diamond A; (3) the stock was sold by E.F. Hutton on behalf of Mr. Anderson not Diamond A; (4) the Diamond A financial statements and accompanying workpapers prepared by Peat, Marwick indicate that the stock was

distributed to, and owned by, Mr. Anderson as of December 31, 1978; and (5) Mr. Anderson reported to the Securities and Exchange Commission that beneficial ownership of the stock was transferred to him in November 1978.

Respondent does not dispute these facts but discounts them as mere formalities employed by petitioners to camouflage the substance of the transaction. Respondent once again contends that, in substance, the 100,000 shares of ARCO stock were never truly released from the collateral base which secured Diamond A's $10 million line of credit. Therefore, according to respondent, Mr. Anderson was not given full unrestricted use of the stock in the November 1978 distribution. In any event, according to respondent, Diamond A continued to exercise control over the ARCO stock and continued to enjoy the economic benefits associated with ownership of the stock. Therefore, respondent concludes, the true distribution of ARCO stock to Mr. Anderson took place in January 1979 when, according to respondent, the bank allowed the stock to be sold on the open market and allowed the proceeds to be used to pay down Mr. Anderson's personal indebtedness. Since Diamond A had current earnings and profits of at least $5,695,361 for its taxable year which ended on December 31, 1979, respondent concludes that the distribution of ARCO stock was a taxable dividend to Mr. Anderson to the extent of the stock's fair market value.

We agree with respondent that the appropriate measure of whether a distribution from a corporation occurred in a certain year is whether the distributed property became subject to the shareholder's unrestricted control in that year. For example, section 1.301-1(b), Income Tax Regs., provides that, "A distribution by a corporation to its shareholders shall be included in the gross income of distributees when the cash or other property is unqualifiedly made subject to their demands." This regulation has been approved and applied on numerous occasions. *Avery v. Commissioner,* 292 U.S. 210 (1934). Further support for this unrestricted control test can be found in the context of the accumulated earnings tax, where a "dividends paid" deduction from the undistributed earnings and profits which are subject to tax is allowed only when control of the distrib-

uted property has passed absolutely and irrevocably from the distributing corporation to its shareholders. *Royal Mfg. Co. v. Commissioner,* 139 F.2d 958, 959 (3d Cir. 1943), affg. a Memorandum Opinion of this Court.

In *Schinebro, Inc. v. Commissioner,* 131 F.2d 504 (2d Cir. 1942), revg. on another issue and affg. this issue 45 B.T.A. 580 (1941), the corporation declared a dividend in kind of 1,000 shares of stock in a Texas oil company. At the time of the dividend declaration, the stock was being used as collateral for a trading account with a stockbroker. The stock was never released from collateral and was eventually sold for a loss which was claimed by the corporation on its own return. The Second Circuit denied the corporation a dividends paid deduction because the corporation continued to exercise dominion over the stock by leaving it as collateral with the brokerage house. *Schinebro, Inc. v. Commissioner, supra* at 505.

Similarly, in the instant case, if we were to agree with respondent that the ARCO stock was never truly released from collateral, we would conclude that Mr. Anderson was not given unrestricted control of the stock and, therefore, we would disregard the November 1978 distribution. The same conclusion might be appropriate if we were to find that Mr. Anderson, in his individual capacity as owner of the stock, immediately repledged the shares as security for Diamond A's indebtedness after an initial bona fide release.

In reaching our conclusion in the instant case, we reiterate that, contrary to respondent's argument, the bank did release the 100,000 shares of ARCO stock from the collateral base which secured Diamond A's $10 million line of credit. The November 28, 1978, letter agreement between Mr. Anderson and the bank, on which much of respondent's argument is based, clearly contemplates the initial release of the ARCO stock. Respondent has failed to present any proof that might lead us to a contrary conclusion. However, because of this same letter agreement, we do not accept petitioner's contention that the initial release was uncondi-tional.

Petitioners contend that parol evidence which they offered shows that the letter agreement was not intended to place any restrictions on Mr. Anderson's right to sell the ARCO

stock. Respondent contends that any parol evidence offered in this case should be completely disregarded citing *Commissioner v. Danielson,* 378 F.2d 771, 775 (3d Cir. 1967), remanding 44 T.C. 549 (1965). After considering all the testimony in this case, we conclude that, contrary to petitioners' contention, the letter agreement was a binding agreement by Mr. Anderson not to sell the 100,000 shares of ARCO stock. Therefore, respondent's contention as to the admissibility of the parol evidence is of no consequence. However, since the parties devote so much of their briefs to the argument with respect to the parol evidence rule, we do call attention to the numerous cases in which we have refused to follow this *Danielson* rule, but have rather adopted the "strong proof" rule, except in cases appealable to the Third Circuit. *G.C. Services Corp. v. Commissioner,* 73 T.C. 406, 412 (1979); *Schmitz v. Commissioner,* 51 T.C. 306, 315-316 (1968), affd. sub nom. *Throndson v. Commissioner,* 457 F.2d 1022 (9th Cir. 1972). In *Estate of Craft v. Commissioner,* 68 T.C. 249 (1977), we stated that:

in those instances where we are called upon to make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we must look to that State's parol evidence rule in deciding whether or not to *exclude* extrinsic evidence * * * [*Estate of Craft v. Commissioner, supra* at 263. Emphasis supplied.]

We then determined that a West Virginia court (the written instrument at issue had been drafted under West Virginia law) would *bar the admission* of any extrinsic evidence and we followed suit. *Estate of Craft v. Commissioner, supra* at 264.

Under California law, extrinsic evidence is admissible, even if a written instrument is unambiguous, when it is offered to explain the meaning of the instrument and the language of the instrument is reasonably susceptible to the contended meaning. *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 69 Cal. Rptr. 561, 442 P.2d 641 (1968). In the instant case, we conclude that a California court (the written instrument in the instant case was drafted under California law) would admit the extrinsic evidence, offered by petitioners in an effort to prove their contention that Mr. Anderson's unam-

biguous covenant not to sell the ARCO stock was not intended to have any legal effect, because the language employed in the letter agreement is reasonably susceptible to such a construction. *Tahoe National Bank v. Phillips,* 4 Cal. 3d 11, 92 Cal. Rptr. 704, 480 P.2d 320 (1971), is distinguishable from the instant case because the written instrument in that case was a standard form, selected from an array of available forms, by the very banking institution which was attempting to vary the meaning of the instrument. In this case, the letter agreement was not a standardized form composed by the bank's legal department. It was an imprecisely drafted contract composed by a banking executive who was not a lawyer.

At the trial, we admitted the parol evidence. After considering the arguments of the parties, we conclude that a California court would also admit parol evidence in connection with the letter agreement. However, after weighing the evidence, we conclude that the parties to the letter agreement intended to be legally bound by its unambiguous terms.

The unambiguous language of the letter agreement shows that the release of ARCO stock from Diamond A's collateral base was conditioned on Mr. Anderson's agreement, undertaken in his individual capacity, not to sell or otherwise dispose of the stock.[17] Both Mr. Vine and Mr. Hacking, the bank officials in charge of Diamond A's credit relationship, viewed the letter agreement as creating an enforceable stipulation which necessarily had to be removed before the shares could be sold. Although Mr. Anderson testified at trial that he viewed the letter agreement as nothing more than a "comfort" or confirmation letter, the record shows that he understood its meaning and his signature indicates his acceptance of the stipulation contained therein. Petitioners have simply failed to present any creditable evidence that the parties did not intend to create a condition on the release of ARCO stock from Diamond A's collateral base.[18]

---

[17] We note that the second paragraph of the letter agreement is clearly directed to Mr. Anderson in his individual capacity rather than in his capacity as an officer of Diamond A.

[18] We also reject petitioners' repeated attempts to characterize the letter agreement as preventing only the removal, from South Spring, of the *proceeds* from a sale of the ARCO stock rather than preventing the removal of the stock itself. Petitioners base these attempts on an isolated statement by Mr. Vine at trial that the bank, "wanted to be sure the 500,000 [sic] shares or its proceeds, or something, did not get out of our guarantor's hands." However,

We agree with respondent that Mr. Anderson was not released from his covenant not to sell or otherwise remove the stock from South Spring until sometime after January 1, 1979.[19] It is not clear from the record on what exact date after the first of the year this release took place. The release may have been granted in a telephone conversation between Mr. Anderson and Mr. Vine which took place on January 3, 1979. The release may have taken place on January 10, 1979, when the first shares of ARCO were sold by E.F. Hutton on behalf of Robert Anderson. The release may have taken place on February 1, 1979, when the sales proceeds were finally wired to the First National Bank of Chicago and used to pay down Mr. Anderson's personal debt. However, because we conclude that Mr. Anderson's promise not to sell the ARCO stock was insufficient to create a security interest in favor of the bank and, therefore, Mr. Anderson's ownership rights in the stock were never legally restricted, we need not determine the exact date during 1979 on which the pledge was released.

We initially note that, although State law does not control the treatment of a transaction for Federal income tax purposes, State law still determines the legal rights and interests of the parties to the transaction. *Burnet v. Harmel,* 287 U.S. 103 (1932), and *Morgan v. Commissioner,* 309 U.S. 78 (1940). Petitioners assert that the law of California, the State where the agreement between Mr.

---

Mr. Vine also testified on numerous occasions that the letter was intended to restrict the removal of the stock itself from South Spring. More importantly, the letter agreement clearly restricts the sale of the stock itself and never even contemplates the possibility of there being proceeds from a sale of the ARCO stock. We reject petitioners' attempts to vary the clear terms of the letter agreement.

[19]We recognize that Mr. Vine testified the release date was sometime in December 1978. However, Mr. Vine's testimony on this point was far from definitive. Moreover, Mr. Hacking could not testify as to *any* specific date when the stock was released. On the other hand, Mr. Anderson testified that he first notified the bank that he intended to sell the ARCO stock in the stock sale authorization letters which were dated Jan. 5, 1979. The confirmation letter which was drafted by Peat, Marwick pursuant to their preparation of Diamond A's 1978 balance sheet states that:

b. *Subsequent to December 31, 1978* various verbal discussions with the Bank of America took place whereby the Bank agreed to release as collateral for the Bank's lines of credit, the 100,000 shares of ARCO stock referred to in 11A above. This release allowed the sole stockholder to sell the stock and dispose of the proceeds as he deemed appropriate. [Emphasis supplied.]

In short, there is no reliable evidence which would support an inference that the release occurred before January 1979. On the other hand, there is substantial reliable evidence that the release occurred after December 1978.

Anderson and the bank arose and where the ARCO stock was located at the time, should determine the substantive effect of the rights and responsibilities created by the letter agreement. Respondent does not dispute this assertion and, therefore, we will apply the California Commercial Code to the transaction before us since the agreement bears an "appropriate" relation to the State of California. Cal. Com. Code Ann., sec. 1105(1) (West 1964 & Supp. 1988).

Under section 8321(1) of the California Commercial Code, a security interest in a certificated security will be *enforceable* only if the security, "is in possession of the secured party pursuant to *agreement.*" (Emphasis supplied.) Cal. Com. Code Ann., sec. 8321(1) (West 1964 & Supp. 1988). Thus, before the question of enforceability can arise, there must first exist an oral or written agreement which creates a security interest in specified property.[20] We conclude that such an agreement is lacking in the present case.

Under section 9105(1) of the California Commercial Code, a security agreement is defined as an agreement which creates or provides for a security interest.[21] Cal. Com. Code Ann., sec. 9105(1) (West 1964 & Supp. 1988). Although no magic words or precise form are necessary to create or provide for a security interest, there must be language in the instrument which leads to the logical conclusion that it was the intention of the parties that a security interest be created. *In Re Amex-Protein Development Corp.,* 504 F.2d 1056, 1058-1059 (9th Cir. 1974). According to the Supreme Court of California, "In traditional usage, a 'security' device is one which entitles the secured party to ownership of some specified fund or asset in the event the security-giver defaults on the underlying obligation." *Greve v. Leger, Ltd.,* 64 Cal. 2d 853, 52 Cal. Rptr. 9, 415 P.2d 824, 828 (1966).

---

[20]Sec. 8-321(3)(a) of the Uniform Commercial Code, which corresponds to sec. 8321(3) of the California Commercial Code, specifically states that no written security agreement signed by the debtor is necessary to make a security interest enforceable. U.C.C. sec. 8-321, 2A U.L.A. 322 (Supp. 1977). However, in adopting this provision, California omitted par. (a) in sec. 8-321(3). Cal. Com. Code Ann., sec. 8321(3) (West 1964 & Supp. 1988). Therefore, California appears to have retained the requirement that there be a security agreement covering the subject property.

[21]The provisions of Division 9 of the California Commercial Code are applicable to "any transaction (regardless of form) which is intended to create a security interest in personal property." Cal. Com. Code Ann., sec. 9102(1)(a) (West 1964 & Supp. 1988). The provisions of Division 9 are explicitly made applicable to a security interest in a certificated security by sec. 8321(3). Cal. Com. Code Ann., sec. 8321(3) (West 1964 & Supp. 1988).

It appears well settled that a purely negative covenant not to sell or encumber property undertaken in connection with a debt obligation is insufficient to create a security interest in the property which is subject to the covenant.[22] *Browne v. San Luis Obispo National Bank,* 462 F.2d 129 (9th Cir. 1972); *Tahoe National Bank v. Phillips,* 4 Cal. 3d 11, 92 Cal. Rptr. 704, 480 P.2d 320 (1971); and *Equitable Trust Co. v. Imbesi,* 280 Md. 249, 412 A.2d 96 (Md. Ct. App. 1980).[23] Instead, the covenant itself, rather than the subject property, serves as collateral for the underlying obligation. *Tahoe National Bank v. Phillips, supra* at 711.[24] Thus, a personal suit against the promisor for breach of the underlying agreement is the only remedy available. *Browne v. San Luis Obispo National Bank, supra* at 134. The promisee under a negative covenant would not be entitled to possession or return of the subject property, even if the covenant not to sell is broken, since the agreement does not create rights, whether legal or equitable, in the subject property. *Equitable Trust Company v. Imbesi, supra* at 107.[25]

In the instant case, a plain reading of the November 28, 1978, letter agreement leads inescapably to the conclusion that the parties did not intend to create a security interest in the distributed stock.[26] The letter agreement, which was agreed to and signed by Mr. Anderson, provides as follows:

Dear Mr. Anderson:

Bank of America will agree to release your pledge of 100,000 shares of Atlantic Richfield Company common stock held by us in support of the Diamond A Cattle Company's secured line of credit in the amount $10,000,000 and will allow you to transfer those shares from Diamond A Cattle Company to The South Spring Company.

You have agreed not to sell, or otherwise remove those shares from the South Spring Company until such time as you have accepted an offer for

---

[22]Such negative covenants, where a party agrees not to convey or otherwise encumber specific property, are sometimes referred to as "negative pledge agreements." *Tahoe National Bank v. Phillips,* 4 Cal. 3d 11, 480 P.2d 320, 92 Cal. Rptr. 704 (1971).

[23]See also G. Gilmore, Security Interests in Personal Property, sec. 38.5, at 1017 (1965); 4 American Law of Property, sec. 16:38, at 77 (1952); G. Osborne, Handbook on the Law of Mortgages, sec. 44 (2d ed. 1970); and Coogan, Kripke & Weiss, "The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements," 79 Harv. L. Rev. 229, 264 (1965).

[24]See also G. Gilmore, *supra* at 38.4 and G. Osborne, *supra* at 44.

[25]See also G. Gilmore, *supra* at 38.4.

[26]We note that this conclusion is consistent with the testimony of all parties to the agreement.

the sale of the Big Bend Ranch; the proceeds of such sale will be used to pay down Diamond A indebtedness to Bank of America.

Significantly, this letter agreement contains no covenants affirmatively granting a security interest to the bank in the distributed shares. Nor does the agreement entitle the bank to possession of the stock. The agreement is a mere promise, on the part of Mr. Anderson, that he will not sell or otherwise remove the stock from South Spring. The agreement does not, in any way, tie the obligation not to sell to Diamond A's continued satisfaction of its credit obligations, nor does it provide any remedy, such as a lien on the stock, in the event Diamond A should default on its debts. The agreement does not even provide the bank with a remedy, such as ownership or continued possession, in the event Mr. Anderson breaches his covenant not to sell. Furthermore, the bank did not have, in its possession, a stock power covering the retitled shares which would have enabled it to sell the stock in its possession. Thus, in the event of default, the bank's sole recourse would be to sue Mr. Anderson personally for breach of covenant. In such a suit, the bank's sole remedy would be money damages.

Under these circumstances, we hold that the negative covenant in the instant case, which Mr. Anderson undertook in his individual capacity after the stock was initially released from collateral, was insufficient to re-create a security interest in the ARCO stock and, consequently, the letter agreement was not a security agreement within the meaning of section 9105(1) of the California Commercial Code. Since no other security agreement or lent collateral agreement covering the distributed shares has been brought to our attention, we conclude that, despite his promise not to sell the ARCO stock, Mr. Anderson received unrestricted legal dominion and control over the ARCO stock in November 1978.

We note that, consistent with our conclusion, the November 1978 distribution from Diamond A transferred to Mr. Anderson all the legal and beneficial incidents normally associated with the ownership of stock. Mr. Anderson became record owner of the ARCO stock in November 1978 when his ownership was registered on the books of ARCO. Under section 8207(1) of the California Commercial Code,

the issuer of stock (i.e., the Atlantic Richfield Co.) is authorized to treat such a record owner, "as the person exclusively entitled to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner." Cal. Com. Code Ann., sec. 8207(1), (West 1964 & Supp. 1988).[27]

Thus, due to the operation of State law, Mr. Anderson received much more than bare legal title to the 100,000 shares of ARCO stock in November 1978. He also received the rights, benefits, and burdens normally associated with the ownership of stock. If an ARCO shareholders' meeting had been called, Mr. Anderson, not Diamond A, would have the right to vote the 100,000 shares. If ARCO had declared a dividend, Mr. Anderson, not Diamond A, would have benefited from this declaration. Finally, if the stock had declined in value between the date it was distributed and the date it was sold, Mr. Anderson, not Diamond A, would have borne the burden of this decline.

We are not unmindful of the fact that Diamond A may have continued to enjoy some benefit from the ARCO stock after the November distribution. Mr. Anderson's agreement not to sell the stock may have enabled Diamond A to maintain a higher outstanding balance under the $10 million line of credit than it would have, had the release been without reservation.[28] Furthermore, if Diamond A defaulted on its loans and the bank were somehow able to foreclose on and sell Mr. Anderson's ARCO stock in order to satisfy Diamond A's indebtedness, we seriously doubt that Mr. Anderson would seek reimbursement for this loss from his wholly owned corporation even if he were entitled to

---

[27]The Uniform Commercial Code contains identical language as does the commercial code of the State of Pennsylvania, the State of incorporation of Atlantic Richfield Co. U.C.C., sec. 8-207, 2A U.L.A. 520 (1977), and Pa. Com. Code Ann., sec. 8207 (Purdon's 1984).

[28]We note, however, that this is by no means clear from the record. For example, both Mr. Vine and Mr. Hacking testified that they felt the $10 million line of credit was sufficiently collateralized to allow the release of 100,000 shares of ARCO stock. It does appear that, if the 100,000 shares of ARCO stock are included in the collateral base at the end of November, the $10 million line of credit is overcollateralized by approximately $3.57 million. Moreover, even if the 100,000 shares are removed, the loan is overcollateralized by approximately $16,000. On the other hand, if the bank determined there was sufficient collateral to meet Diamond A's credit needs, there would have been no need to make the November release of the 100,000 shares conditional or, for that matter, require a $22.5 million personal guarantee from Anderson.

subrogation under State law.[29] However, Mr. Anderson undertook his covenant not to sell in his individual capacity, and we conclude that retention by Diamond A of these indirect and remote benefits is not sufficient reason to disregard the 1978 distribution for tax purposes.

Respondent, in effect, argues that the November 1978 distribution should be disregarded because, as a practical matter, the bank had possession of the stock certificates and Mr. Anderson would not breach his individual covenant for fear the bank would retaliate by demanding payment in full discharge of Diamond A's indebtedness. It seems likely that the informal agreement whereby the bank took custody of the retitled ARCO stock was arranged at the request of the bank to prevent a sale and was not, contrary to petitioners' assertion, a mere "safekeeping arrangement." The existence of such an informal custody arrangement would explain many of the incongruencies which appear in the record.

The existence of an informal custody arrangement would explain why the ARCO stock was returned to the bank immediately after being retitled. It would also explain why the stock was placed in an informal safekeeping arrangement at a branch familiar with the Diamond A situation, rather than in a formal safekeeping arrangement with the trust department of the bank's main branch which was located right next door to the ARCO and Bank of America towers. It would explain why, despite testimony by Sara Conroy that a collateral receipt was prepared every time collateral was received by the Seventh and Olive note department, a blank generic receipt, rather than a true collateral receipt, was issued when the ARCO stock was received. Finally, the existence of this informal agreement, coupled with the November 28, 1978, letter agreement, might explain why employees of Diamond A, the bank, and Peat, Marwick erroneously concluded that the stock was collateral for Diamond A's indebtedness and reflected this conclusion on the documents and records they prepared.

---

[29] As stated previously, the letter agreement never even contemplates that the stock will remain subject to Diamond A's continued satisfactory performance of its debt obligations. Under such circumstances, we believe it extremely unlikely that the bank would be entitled to dispose of the stock for its own benefit should Diamond A default on its indebtedness.

We agree that, in a practical sense, Mr. Anderson may have been discouraged by this informal arrangement from pursuing an immediate sale of the distributed stock. However, we note that this practical restriction was insufficient to prevent a subsequent sale of the stock, even after it was clear that the Big Bend Ranch would not be sold as scheduled.[30] In any event, we conclude that this short-lived practical restriction does not justify a complete disregard of the substantive legalities of stock ownership. *Helvering v. Clifford*, 309 U.S. 331, 335 (1940). Legally, the bank's mere possession of the stock pursuant to an informal arrangement was insufficient to create a security interest, especially where there is no evidence that clearly indicates that the parties did intend to create such an interest. Since the arrangement did not give the bank any legal or equitable rights in the stock, Mr. Anderson's legal dominion and control over the stock was unrestricted and, therefore, the November 1978 distribution will be given substantive effect.

Respondent finally contends that the November 1978 distribution should be disregarded because the distribution was motivated solely by Mr. Anderson's desire to avoid Federal income taxes at both the individual and corporate levels. We are aware that the transaction in the instant case was, at least in part, structured to provide the maximum possible tax savings to Mr. Anderson and his wholly owned corporation. Whether this tax savings was the sole motivation is irrelevant. A taxpayer is not required to structure his affairs in such a way as to provide the maximum benefit to the Federal fisc. Where, as in the instant case, the substance of a transaction comports with its form, it will be respected for Federal tax purposes.

Thus, we hold that the 100,000 shares of distributed ARCO stock were, in substance, sold by Mr. Anderson rather than Diamond A and that the distribution of the ARCO stock took place, in substance, in November 1978 rather than January 1979.

*Decision will be entered under Rule 155.*

---

[30]Respondent contends that the subsequent sale was allowed by the bank only after Diamond A agreed to sell 123,500 shares of the remaining ARCO stock and use the proceeds to pay down the balance of the $10 million line of credit. However, respondent has produced no evidence to support his contention and, therefore, it is mere speculation.